1                    UNITED STATES DISTRICT COURT FOR
                       THE DISTRICT OF MASSACHUSETTS
2

3
                                        )
4   UNITED STATES OF AMERICA,           )
                                        )
5            Plaintiff,                  )
                                        )    Criminal Action
6                                       )    No. 05-10204-GAO
    vs.                                 )
7                                       )
                                        )
8   PAUL HICKS,                         )
                                        )
9            Defendant.                 )
                                        )

10

11

12                      TRANSCRIPT OF JURY TRIAL
                              DAY FOUR

13

14          BEFORE THE HONORABLE GEORGE A. O'TOOLE, JR.
                    UNITED STATES DISTRICT JUDGE

15

16                  United States District Court
                   John J. Moakley U.S. Courthouse
17                       1 Courthouse Way
                   Boston, Massachusetts  02210
18                       October 19, 2006
                           9:20 a.m.
19

20
                         *  *  *  *  *  *
21

22
                  SHELLY M. KILLIAN, RPR, CM, CRR
23                    Official Court Reporter
                   John J. Moakley U.S. Courthouse
24                 1 Courthouse Way, Room 3510
                       Boston, MA  02210
25                       (617) 737-7117

PDF created with pdfFactory trial version www.pdffactory.com

1 APPEARANCES:

2 For the Plaintiff:

3     Jonathan F. Mitchell, AUSA
    United States Attorney's Office
4     John Joseph Moakley Federal Courthouse
    1 Courthouse Way, Suite 9200
5     Boston, Massachusetts  02210

6 For the Defendant:

7     Joseph F. Krowski, Jr., Esq.
    Law Offices of Joseph F. Krowski
8     30 Cottage Street
    Brockton, Massachusetts  02301

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    EXAMINATION INDEX

2
DEAN LEVANGIE
3           CROSS BY MR. KROWSKI . . . . .    4
            REDIRECT BY MR. MITCHELL  . . .  19
4
ROSEMARIE HICKS
5           DIRECT BY MR. KROWSKI . . . . .  25
            CROSS BY MR. MITCHELL . . . . .  36
6                    *  *  *  *  *
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    P R O C E E D I N G S

 2              (The following proceedings were held in open

 3     court before the Honorable George A. O'Toole, Jr.,

 4     United States District Judge, United States District

 5     Court, District of Massachusetts, at the John J. Moakley

 6     United States Courthouse, 1 Courthouse Way, Boston,

 7     Massachusetts, on October 19, 2006.)

 8              The defendant, Paul Hicks, is present with

 9     counsel.  Assistant U.S. Attorney Jonathan Mitchell is

10     present.)

11              THE CLERK:  All rise.

12              (Jury entered courtroom, 9:24 a.m.)

13              THE CLERK:  Please be seated.

14              THE COURT:  Good morning, jurors.

15              Do you have the witness?

16              MR. MITCHELL:  Yes, your Honor.  Please resume

17     the stand.

18              (Dean LeVangie, previously sworn, resumed

19     stand.)

20              MR. KROWSKI:  Good morning, your Honor.  May I

21     proceed?

22              THE COURT:  Please.

23              MR. KROWSKI:  Thank you.

24                       CROSS-EXAMINATION

25     BY MR. KROWSKI:
```

1   Q.  Good morning, Trooper LeVangie.

2   A.  Good morning, sir.

3   Q.  You testified yesterday to some extent about your

4   vast experience, correct?

5   A.  Yes, sir.

6   Q.  Dealing with narcotics cases, correct?

7   A.  Correct.

8   Q.  Dealing with narcotics cases in the city of

9   Brockton, Massachusetts?

10   A.  Yes, sir.

11   Q.  As a member of the Massachusetts State Police?

12   A.  Correct.

13   Q.  As a member of the Massachusetts State Police, many

14   times your investigations -- in your investigations you

15   work with members of the Brockton police?

16   A.  That's correct.

17   Q.  The witnesses in this case, you're aware of who they

18   are, correct?

19   A.  Yes, sir.

20   Q.  Trooper Long?

21   A.  Yes, sir.

22   Q.  You've worked with him many times in the past,

23   correct?

24   A.  Correct.

25   Q.  Detective Keating, you've worked with him?

1    A.   Yes, sir.

2    Q.   Detective Costello, you've worked with him?

3    A.   Correct.

4    Q.   These are colleagues of yours?

5    A.   Yes, sir.

6    Q.   And they're also friends of yours, correct?

7    A.   Some of them, yes, sir.

8    Q.   Now, the way this works is you weren't part of this

9    actual investigation, were you?

10   A.   Partly, yes, sir.

11   Q.   But ultimately it was Trooper Long's investigation?

12   A.   Correct.

13   Q.   At some point you get contacted that they want you

14   to give your opinion based upon your experience here in

15   court, correct?

16   A.   Yes, sir.

17   Q.   That's something you've been asked to do before,

18   correct?

19   A.   Yes, sir.

20   Q.   And you know the opinion you gave yesterday is

21   favorable to the government, correct?

22   A.   Yes, sir.

23   Q.   How many times have you testified in court?

24   A.   Well in excess of 300 times, sir.

25   Q.   In those 300 times, have you ever testified in a way

1    that wasn't favorable to the government?

2    A.   Not that I can recall, no, sir.

3    Q.   So your track record is 100 percent of the times

4    that you testify, you give an opinion that's favorable

5    to the government, to the prosecutor, correct?

6    A.   Yes, sir.

7    Q.   And to your colleagues, correct?

8    A.   Yes, sir.

9    Q.   And to base that opinion on anything, you're told

10   what the facts of a specific case are, correct?

11   A.   Correct.

12   Q.   So before you gave that profile testimony to the

13   jury yesterday about defendants securing themselves with

14   weapons, you had already been told that bullets were

15   found at the location, correct?  You knew that?

16   A.   Yes, sir.

17   Q.   Before yesterday you came in and said, well, drug

18   dealers will often lend their guns out.  You had already

19   been told that a gun wasn't found, correct?

20   A.   Correct.

21   Q.   When yesterday you said, Well, sometimes there's

22   cash and money found at a residence, you had already

23   been told that the defendant -- or excuse me, that there

24   was cash found in a pocket at the house, correct?

25   A.   Correct.

1    Q.  You heard a telephone conversation from a year
2    before the alleged incident, correct?
3    A.  Yes, sir.
4    Q.  That was Mr. Hicks calling Miss Yarrell?
5    A.  Correct.
6    Q.  You said yesterday that they will secure money to do
7    things such as hire a lawyer, correct?
8    A.  Yes, sir.
9    Q.  You had already -- before you gave that opinion
10   yesterday, you had already given that opinion -- excuse
11   me, you had already heard the taped call and the part
12   about get a thousand dollars to the lawyer, correct?
13   A.  Yes, sir.
14   Q.  Now, in Brockton there is no way to pigeon hole drug
15   activity, correct?
16   A.  I'm not sure what you mean by pigeon hole.
17   Q.  Let me put it broadly.  The drug trade in that city
18   is not limited to any one race of individuals?
19   A.  Correct.
20   Q.  Any one age of individuals?
21   A.  Correct.
22   Q.  Any one gender of individuals?
23   A.  Correct.
24   Q.  There's a large Cape Verdean population in Brockton,
25   correct?

1    A.  That's correct.

2    Q.  A Caucasian population?

3    A.  Yes, sir.

4    Q.  An African-American population?

5    A.  Yes, sir.

6    Q.  Dominican population?

7    A.  Yes, sir.

8    Q.  Puerto Rican population?

9    A.  Correct.

10   Q.  Now, in Brockton there are different types of drug

11   dealing activities, correct?

12   A.  Yes, sir.

13   Q.  There's the rudimentary, basic street-level

14   transaction, correct?

15   A.  Yes, sir.

16   Q.  You might have a small person on the corner of North

17   Main Street stick out a small bag out of his hand, hand

18   it to an undercover and receive money for it, correct?

19   A.  Possible, yes, sir.

20   Q.  There's the more sophisticated services, correct?

21   A.  Yes, sir.

22   Q.  A delivery service is a more sophisticated service,

23   is it not?

24   A.  Yes, sir.

25   Q.  In your training and experience, people in a

1    delivery service go through great pains to insulate
2    themselves, correct?
3    A.   Often times, yes, sir.
4    Q.   Because they know if they ever do get caught or
5    there is a search warrant, they have to take certain
6    precautions, correct?
7    A.   Correct.
8    Q.   One of the things is typically a person will put
9    utility bills in someone else's name, correct?
10   A.   Can be, yes, sir.
11   Q.   They will put phone bills in someone else's name?
12   A.   Possibly, yes, sir.
13   Q.   They will put cell phone bills in someone else's
14   name?
15   A.   Yes, sir.
16   Q.   You looked at a -- an exhibit yesterday,
17   Government's Exhibit No. 4, the Nextel cell phone
18   records, correct?
19   A.   No, sir, I never saw that.
20   Q.   Have you seen them before?
21   A.   Yes, sir.
22   Q.   You saw the Nextel cell phone that purportedly
23   belonged to Mr. Hicks?
24   A.   Correct.
25   Q.   And before you gave that opinion about those short

PDF created with pdfFactory trial version www.pdffactory.com

1    one-minute calls taking place, you were already aware

2    that on the phone bill of the phone that purportedly

3    belonged to Mr. Hicks there was a hundred plus calls

4    over a two-day period, correct?

5    A.  After reviewing that, yes, sir.

6    Q.  And you reviewed that before you came in with that

7    opinion, correct?

8    A.  Yes, sir.

9    Q.  You use a cell phone, correct?

10    A.  Yes, sir.

11    Q.  A Nextel?

12    A.  Correct.

13    Q.  Basically everyone today uses a cell phone, correct,

14    nothing novel about that?

15    A.  Yes, sir.

16    Q.  Did you look at that cell phone bill, the Nextel

17    bill?

18    A.  The amount of calls, yes, sir.

19    Q.  You're aware that Mr. Hicks was taken into custody

20    because you did have some part of this case, correct?

21    A.  Yes, sir.

22    Q.  You're aware that Mr. Hicks was taken into custody

23    on January 20th, 2005, correct?

24    A.  That's correct.

25    Q.  How do you account for all the phone calls being

1    made after that date?

2    A.  I cannot.

3    Q.  Well, it's fair to say because you looked at that

4    exhibit, there's dozens if not hundreds of phones calls

5    that were made after he was in custody from that same

6    cell phone, true?

7    A.  I did not see that, sir.

8              MR. KROWSKI:  May I have Government's Exhibit

9    No. 4, please.

10             May I approach, your Honor?

11             THE COURT:  You may.

12   BY MR. KROWSKI:

13   Q.  Do you need a minute, Trooper?

14   A.  Please. (Reviews documents.)  Yes, sir.

15   Q.  There were calls made after Mr. Hicks was in custody

16   as well, correct?

17   A.  Yes, sir.

18   Q.  And in your training and experience, sometimes even

19   though a cell phone bill is in the name of one person,

20   someone else could possibly be using it, correct?

21   A.  Correct.

22   Q.  Now, yesterday you talked about different street

23   terms.  You talked about an eight ball, correct?

24   A.  Yes, sir.

25   Q.  And that's a common term?

1    A.   Correct.

2    Q.   Three and a half grams of cocaine?

3    A.   Approximately, yes, sir.

4    Q.   The term eight ball is derived from it's an eighth

5    of an ounce, correct?

6    A.   Correct.

7    Q.   Street value about $150?

8    A.   $125, 150, yes, sir.

9    Q.   A little less than, what, about $40 a gram?

10   A.   Correct.

11   Q.   And that's a term that you hear often?

12   A.   Yes, sir.

13   Q.   A "twist" is a term you hear often, correct?

14   A.   Correct.

15   Q.   But then you were asked to interpret other terms

16   such as "little people."

17   A.   Correct.

18   Q.   When you were asked to interpret little people,

19   you're just giving an opinion, correct?

20   A.   Correct.

21   Q.   You heard the conversation, you read the transcript,

22   and you're assuming what he was talking about when he

23   said little people, correct?

24   A.   Correct.

25   Q.   That's not a term you've heard often, correct?

1    A.   Little people, no, sir.

2    Q.   As a matter of fact, in those 300 cases tell me one

3    where you heard the term little people mentioned.

4    A.   Not one, sir.

5    Q.   So that's not some term of art in the drug trade,

6    "little people," correct?

7    A.   No, sir.

8    Q.   What about raw food and cooked food?

9    A.   Yes, sir.

10   Q.   Have you heard that before?

11   A.   Yes, sir.

12   Q.   Often?

13   A.   Several times.

14   Q.   Tell me about the last time you testified about

15   hearing raw food or cooked food.

16   A.   I have not testified about it.

17   Q.   In all 300 cases?

18   A.   Correct.

19   Q.   In all 300 cases where you gave that favorable

20   opinion to your colleagues and the government?

21   A.   Correct.

22   Q.   And you certainly get paid for your time to come in

23   here and testify, correct?

24   A.   I'm on straight time, sir.

25   Q.   Now, you talked yesterday about drug dealers taking

PDF created with pdfFactory trial version www.pdffactory.com

```
1   security precautions, correct?
2   A.  Yes, sir.
3   Q.  And those security precautions might be arming
4   themselves with a firearm?
5   A.  Yes, sir.
6   Q.  And then they might lend it out to someone, correct?
7   A.  Yes, sir.
8   Q.  You have no evidence in this case there was ever a
9   firearm possessed by Mr. Hicks, correct?
10  A.  No, sir.
11  Q.  No evidence he ever lent one out to anyone, do you?
12  A.  No, sir.
13  Q.  And you know all that was found in this case were
14  different calibers of bullets, correct?
15  A.  And clips, yes, sir.
16  Q.  And clips.  Can you name a case that you've had
17  where you found just bullets and not a firearm?
18  A.  Not off the top of my head, no, sir.
19  Q.  Can you name one of those 300 times when you
20  testified favorably to the government that you found
21  just bullets and not a firearm?
22  A.  Not specifically, no, sir.
23  Q.  Now, these more sophisticated delivery services
24  would be a service that would operate out of a home,
25  true?  Or an apartment?
```

PDF created with pdfFactory trial version www.pdffactory.com

1    A.   Possibly, yes, sir.

2    Q.   Again, there are great pains, in your experience,

3    that people take to protect themselves, correct?

4    A.   Sometimes, yes, sir.

5    Q.   And in your experience, someone that's involved in a

6    delivery service is going to know what a small,

7    hand-held digital scale is used for, correct?

8    A.   Yes, sir.

9    Q.   They're going to know that's a tool of the trade?

10   A.   Correct.

11   Q.   They're not going to put something with their name

12   on it smack dab next to something like that, are they?

13   A.   I can't answer that.

14   Q.   Well, let's talk about your experience then.   Those

15   300 cases -- actually, do you include arrests and

16   execution of search warrants, thousand cases, correct?

17   A.   In excess of 500, yes.

18   Q.   In those 500 cases, can you tell me an instance

19   where someone had a utility bill with their name on it

20   right next to tools of the trade such as hand-held

21   digital scales?

22   A.   I can testify on numerous occasions of cases where

23   people had bills in the same locations of where

24   paraphernalia was located.   Yes, sir.

25   Q.   Name one.

PDF created with pdfFactory trial version www.pdffactory.com

1    A.   49 Prospect Street.

2    Q.   When was that?

3    A.   That was probably two, three years ago.

4    Q.   So out of those 500 cases, you can give us a case

5    from two or three years ago with one address?

6    A.   Yes, sir.

7    Q.   Name another one.

8    A.   600 Warren Avenue.

9    Q.   And when was that?

10   A.   That was a year and a half ago.

11   Q.   So now a year and a half ago.  So you can name two.

12   A.   I could name others if you'd like.

13   Q.   What were the bills that were found?

14   A.   I believe one was an electrical bill, may have been

15   a cell phone bill.

16   Q.   What was the name of the defendant?

17   A.   One of the defendant's name was Bonilla.

18   Q.   What was his first name?

19   A.   I don't recall his first name, sir.

20   Q.   The point being, again, this is not a science, your

21   testimony, correct?

22   A.   I'm not sure what you mean.

23   Q.   Well, you've never written any literature on this

24   topic, you have?

25   A.   No, sir.

1  Q.  There's no national or even state or local standards

2  on this, is there?

3  A.  Not that I'm aware of, sir, no.

4  Q.  You do go to some continuing education courses,

5  correct?

6  A.  Correct.

7  Q.  But there's no guidelines for you to follow, correct?

8  A.  Not that I'm aware of, no, sir.

9  Q.  You can't read someone's mind?

10  A.  No, sir.

11  Q.  You don't have any background in psychology?

12  A.  No, sir.

13  Q.  Every case is different?

14  A.  Correct.

15  Q.  All people are different?

16  A.  Correct.

17  Q.  The term "regular friends," have you ever heard that

18  used before?

19  A.  No, sir.

20  Q.  So when you were testifying to what it meant to you,

21  you were guessing, correct?

22  A.  Based on the vernacular in that conversation, yes,

23  sir.

24  Q.  But still, even based on that conversation, it was a

25  guess?

 1   A.   In my experience I testified as to what that -- what

 2   he's using that term to relay.

 3   Q.   When was, in those other 500 cases, when have you

 4   heard the term "little people" used?

 5   A.   Never.

 6   Q.   Again, that phone conversation also was from January

 7   2004, correct?

 8   A.   Yes, sir.

 9   Q.   A year before the date of arrest of Mr. Hicks, which

10   was January 20th, 2005?

11   A.   Correct.

12   Q.   And in your experience, people do change, correct?

13   A.   Possibly.

14           MR. KROWSKI:   I don't have any further

15   questions, your Honor.

16           MR. MITCHELL:   A couple of follow-up

17   questions, your Honor.

18                    REDIRECT EXAMINATION

19   BY MR. MITCHELL:

20   Q.   Could you take a look at Government's Exhibit 4,

21   Trooper LeVangie.

22   A.   Yes, sir.

23   Q.   Okay.  Can you turn to I believe it's the page dated

24   January 20th, the list of calls on January 20th, may be

25   the fourth or fifth page.

1    A.  Yes, sir.

2    Q.  Do you see that?

3    A.  Yes, sir.

4    Q.  Okay.  On January 20th, when was the last call?

5    A.  At 6:08 p.m., sir.

6    Q.  And when's the next call?

7    A.  On January 21st at 3:40 p.m.

8    Q.  Okay.  And when's the next call after that?

9    A.  February 4th.

10   Q.  Okay.  So more than two weeks go by between the call

11   on the 21st and the -- what did you say it was, February

12   5th?

13   A.  February 4th, yes, sir.

14   Q.  February 4th , excuse me.  So two weeks go by

15   between the one hundred 60-second call and one hundred

16   60-second third call, correct?

17   A.  Correct.

18   Q.  In your opinion, when you've executed search

19   warrants and found cell phones, have you ever

20   encountered or have you ever seen an investigator use

21   the cell phone to see who's been calling, who the last

22   number called was?

23   A.  Yes, sir.

24   Q.  Okay.  Do you recall, again going back to the certs,

25   the lab certificates you reviewed in this case, was the

PDF created with pdfFactory trial version www.pdffactory.com

1    powder cocaine fully cut based on what you saw in the

2    certificates?

3    A.  Based on my experience, no, it was not.

4    Q.  And so there was still product to be added, correct?

5    A.  Could be, yes, sir.

6    Q.  And when cocaine is cut, on what sort of surface is

7    it usually cut?

8    A.  Any type of flat surface normally, sir.

9    Q.  On a table?

10   A.  Could be a table.  Could be a plate.

11            MR. MITCHELL:  That's all I have, your Honor.

12            THE COURT:  All right, Trooper, thank you.

13   You may step down.

14            THE WITNESS:  Thank you.

15            MR. MITCHELL:  Your Honor, the government

16   rests.

17            THE COURT:  Let me see counsel at the side,

18   please.

19            (Conference at sidebar commenced.)

20            THE COURT:  I didn't know whether you wanted

21   to come over here or not.

22            MR. KROWSKI:  I did, your Honor.  I'll make an

23   oral motion at this time under Rule 29, preserve our

24   rights.  I will follow that up with an electronic filed

25   rewritten motion.

 1          THE COURT:  Do you want to be heard?

 2          MR. KROWSKI:  Briefly my argument is that

 3     aside from the prior convictions and the conduct

 4     revealed earlier, they don't have any knowledge or

 5     any -- all they have is mere presence.  And even

 6     their -- coupled with knowledge is not enough.  Even if

 7     the prior did show knowledge, there's no evidence that

 8     he was still in some sort of working or joint venture

 9     conspiracy with Miss Yarrell at that address, and

10     there's no connection to the phone conversation, never

11     mentions anything about gun, bullets or weapons.  All he

12     is is merely present.  Even if he knew those bullets

13     were there, what's the connection to him that he had any

14     intent to exercise dominion and control over them?

15          MR. MITCHELL:  There's plenty of evidence of

16     both knowledge of and presence of drugs and his

17     intention to -- besides control over it, his intention

18     to distribute his drugs.

19          Just by way of summary, your Honor, let's

20     start with the priors because Mr. Krowski mentioned the

21     priors do show that he has an MO of selling cocaine.

22     It's -- his intention was to sell the cocaine as opposed

23     to consume because that's what he'd done in the past.

24     And recognize the scales and other paraphernalia because

25     of his experience as a drug dealer.

PDF created with pdfFactory trial version www.pdffactory.com

```
 1              But above all, he lives and lived in that
 2    house.  There were three bedrooms.  Two bedrooms were
 3    occupied by children, the other one was occupied by a
 4    girl friend who owned the house.  We know they're
 5    boyfriend/girl friend, we've seen in the picture.  We
 6    know he was found by himself, the only adult in the
 7    house at the time.  He had just gotten out of the
 8    shower.  Having to live there like -- someone takes a
 9    shower more likely than not when they live there.  He's
10    seated in a place where his position from his stuff
11    is -- his cell phone was used, the ammunition which was
12    used in the drug trade according to Trooper LeVangie.
13    Money, a large amount of cash found right nearby.  We
14    know that based on the telephone calls, he was to use
15    his girl friend as someone who was to sell drugs for
16    him.
17              I could go on, your Honor.  But for all those
18    reasons, based on the Rule 29 standard --
19              THE COURT:  The motion's denied.
20              MR. KROWSKI:  Your Honor, one other issue.  I
21    know we just got back on.  I do have one witness I'm
22    going to call, but I also want the opportunity after
23    we're done presenting our evidence and now that the
24    government's resting to confer with my client on his
25    constitutional right about testifying.  It's something
```

```
 1    that he wants to talk to me about as well.  So I don't
 2    know if I'll be given that opportunity to --
 3                 THE COURT:  I'll give you that, sure.  So what
 4    do you have now?
 5                 MR. KROWSKI:  I have Rosemarie Hicks, his
 6    mother.
 7                 THE COURT:  Is she here?
 8                 MR. KROWSKI:  She was in the building when I
 9    called.  I haven't personally seen her.  But she was
10    coming up the elevator when I called her from the
11    hallway.  I assume she's outside on the bench.  I could
12    call her but then I want the opportunity to speak with
13    my client for just five or ten minutes about his right
14    to testify.
15                 THE COURT:  All right.
16                 Did you coordinate your ties this morning?
17                 (Conference at sidebar concluded.)
18                 MR. KROWSKI:  May I, your Honor?
19                 THE COURT:  Yeah.
20                 MR. KROWSKI:  The defendant would call
21    Rosemarie Hicks.
22                      ROSEMARIE HICKS, SWORN
23                 THE CLERK:  Please be seated.  State your
24    name, spell your last name for the record, speak into
25    the mic and keep your voice up so everyone can hear you.
```

PDF created with pdfFactory trial version www.pdffactory.com

1          THE WITNESS:  My name is Rosemarie Hicks.

2     R-o-s-e-m-a-r-i-e, H-i-c-k-s.

3                    DIRECT EXAMINATION

4     BY MR. KROWSKI:

5     Q.  Good morning, Mrs. Hicks.  How old are you?

6     A.  I'm 55.

7     Q.  Where do you live?

8     A.  56 Ithaca Road, Brockton, Mass.

9     Q.  Who do you live with?

10    A.  With my husband.

11    Q.  What's your husband's name?

12    A.  Paul Hicks.

13    Q.  Where do you work?

14    A.  I work for the Massachusetts State Police.

15    Q.  Specifically doing what?

16    A.  I'm a state trooper.

17    Q.  What does Mr. Paul Hicks, Sr. do for work?

18    A.  He works for the Boston Fire Department.  He's a

19    fire inspector.

20    Q.  How long you have lived at that address of 56 Ithaca

21    Road in the city of Brockton?

22    A.  About approximately nine or ten years.

23    Q.  Paul Hicks to my left with the blue pinstripe suit

24    on is your son?

25    A.  Yes, he is.

1    Q.  I'm going to take you back to the time of January

2    2004.  Was your son Paul Hicks in jail?

3    A.  Yes, he was.

4    Q.  Do you remember when he got out of jail?

5    A.  I don't remember exactly when he got out of jail,

6    but I remember when he got out because he came to live

7    with me.

8    Q.  Do you remember approximately what month or what

9    time of year that was?  If you remember.

10   A.  I want to say the weather was kind of good.  I

11   really don't remember the date.  I really don't remember

12   because --

13              (Court reporter interrupts.)

14   A.  I said I had a son that had died in 2003, so my

15   dates with things -- and I have a very sick son that I

16   keep up with a lot.  And in between trying to keep up

17   with everybody, I do not get to keep dates in my head.

18   And that's why.

19   Q.  By saying the weather was good, do you remember what

20   time of year it might have been?  Roughly?  If you do.

21   If you don't, you don't.

22   A.  I would say it would be May or June.

23   Q.  You said Paul Hicks came -- your son came to live

24   with you?

25   A.  Yes, he did.

PDF created with pdfFactory trial version www.pdffactory.com

1    Q.   Would you describe that address, 56 Ithaca Road.

2    A.   A one-family home.

3    Q.   Who owns the home?

4    A.   Me and my husband.

5    Q.   Bringing you to around that time of May or June of

6    2004, who lived at the home?

7    A.   At that time it was me, my husband, my sister, Paul

8    when he got out of jail and my other son Sir Dwayne.

9    Q.   When Paul got out of jail and came back to live at

10   home with you in 2004, what did he do with himself?

11   A.   He applied himself to go to school because that was

12   one of the conditions for him to live with me.

13   Q.   What school did he apply to?

14   A.   Bay State Technology.  It's like for fixing

15   appliances and air conditioning.

16   Q.   Where was that school located?  Or where is that

17   school located?

18   A.   That school is located in Canton.

19   Q.   How far from your home?

20   A.   Probably about 15, 20 minutes from my home.

21   Q.   Where did Paul stay in your house?  Did he have his

22   own bedroom?

23   A.   Yes, he did.

24   Q.   Have you actually been to the school?

25   A.   Yes, I have.

```
 1   Q.   What were the circumstances of you going to the
 2   school?
 3   A.   Transporting him to school.
 4   Q.   Transporting him.  When Paul got out of jail in that
 5   summer of 2004, did he have transportation?
 6   A.   No.
 7   Q.   How would he get to and from certain places?
 8   A.   He borrowed one of our cars.  His father let him
 9   have use of a vehicle.
10   Q.   How many cars did you and Mr. Hicks own?
11   A.   One each.  And I own my police cruiser.  That's what
12   I take to work.
13   Q.   What kind of cars did you own?
14   A.   A Camry and a Kia.
15   Q.   Do you remember when Paul started school?
16   A.   He started school probably -- I want to say maybe
17   October or November.  Probably November.
18   Q.   In October and November, confining you to weekdays,
19   what would be his daily schedule, if you know?
20   A.   Monday through Friday.  For school?  Monday through
21   Friday.
22   Q.   What time would he get up?
23   A.   About -- between 6 and 6:30.
24   Q.   Would you see him?
25   A.   Yes, I was there.
```

PDF created with pdfFactory trial version www.pdffactory.com

```
 1   Q.  How would he get to school?

 2   A.  He would take one of our vehicles.

 3   Q.  Do you know when he would come home?

 4   A.  He would come home around 3:30, quarter of 4.  I

 5   always got home after him.  Most of the time he was

 6   there when I came home.

 7   Q.  For the most part did he go to school when he was

 8   living at home with you?

 9   A.  Yes, he did.

10   Q.  Do you know a Miss Renee Heywood or Renee Yarrell?

11   A.  Yes, I do.

12   Q.  Is Yarrell her former married name?

13   A.  Yes.

14   Q.  And Heywood is her maiden name?

15   A.  Her maiden name.

16   Q.  How do you know Miss Renee Heywood?

17   A.  I met Renee through my daughter, and then I got to

18   know her more because of my son.

19   Q.  What do you mean when you say because of your son?

20   A.  Him and her had a relationship.

21   Q.  What kind of relationship, if you could describe it?

22   A.  Now boyfriend and girlfriend relationship.

23   Q.  Speaking in terms of summer, fall, early winter of

24   2004 when he had enrolled in school.

25   A.  They had a somewhat relationship.  He didn't know
```

PDF created with pdfFactory trial version www.pdffactory.com

1    her all that long to call it a real serious

2    relationship.  But they did have a relationship.  I

3    didn't see them that much to --

4    Q.  Do you have firsthand knowledge, though, that he

5    would go over to her home?

6    A.  Yes, he would.

7    Q.  Where was her home?

8    A.  Her home was in Brockton on Cabot Street.

9    Q.  Prior to Paul being arrested, had you ever been to

10   that home?

11   A.  Prior to him being arrested when?

12   Q.  Excuse me.  In January of 2005 you know Paul was

13   arrested, correct?

14   A.  Yes.

15   Q.  Prior to that day, had you been over to the Cabot

16   Street home?

17   A.  Yes, I had.

18   Q.  How many times had you been there, if you remember?

19   A.  A few times.  I was there a few times.

20   Q.  Describe the home as you remember it.

21   A.  A single-family home.  When you walk in the front --

22   you go in the side door, you'd go into the kitchen, like

23   a deck.

24   Q.  Back in 2004 did your son Paul Hicks live at Cabot

25   Street?

PDF created with pdfFactory trial version www.pdffactory.com

```
1    A.   No, he lived with me.

2    Q.   You know you're under oath, correct?

3    A.   Yes, I am.

4    Q.   You do have firsthand knowledge he would go there,

5    correct?

6    A.   Correct.

7    Q.   How often would he go there, if you know?

8    A.   He was a grown man.  He never said to me this is

9    where I'm going whenever he left home, but I know he did

10   go over there from time to time.

11   Q.   And that would be -- I'm sorry, finish.

12   A.   Even if he had told me he was going there, I don't

13   know if he went there.  But I would say he went there

14   because they had a little relationship going and they

15   were being in contact.  So he would go over there.

16   Q.   So if I can be clear, he certainly would go over

17   there?

18   A.   Yes.

19   Q.   And he would go over there often?

20   A.   Yes.

21   Q.   Would he spend the night there to your knowledge?

22   A.   To my knowledge I know he didn't spend the night

23   there during the week.

24   Q.   On the weekends it's fair to say?

25   A.   Maybe on the weekends it's fair to say because
```

PDF created with pdfFactory trial version www.pdffactory.com

```
 1   sometimes he wouldn't come home on a weekend.  He don't
 2   tell me if he spends the night with somebody.  That
 3   ain't the kind of thing he tells his mother.  You know,
 4   I'm not that familiar with that kind of situation.
 5   Q.  How old is Paul?
 6   A.  Paul is 34?  I don't know.  I have seven kids and I
 7   have 17 grandkids, so I kind of get messed up on the age
 8   thing.  I think he's 33.
 9   Q.  Sure.  Now, taking you back to winter of 2004, did
10   Paul, to your knowledge, have a bank account?
11   A.  No.
12   Q.  Did you ever have circumstances to go into his
13   bedroom?
14   A.  Positively.
15   Q.  Did you ever find money in his bedroom, large
16   amounts of money?
17   A.  No, sir.
18   Q.  Did you ever find bullets or ammunition?
19   A.  No.  No.  Not in my -- no.
20   Q.  Did you ever see a holster?
21   A.  No.
22   Q.  Did you ever see --
23            MR. MITCHELL:  These are all leading
24   questions, your Honor.
25            THE COURT:  Overruled.  Go ahead.
```

1   Q.  Did you ever -- well, you're a state trooper,

2   correct?

3   A.  Yes, I am.

4   Q.  You know what illegal contraband is, correct?

5   A.  Yes, I do.

6   Q.  Did you ever see any of that in your home?

7   A.  No, I haven't.

8   Q.  How would Paul get spending money?

9   A.  From me and his father.

10  Q.  How much money would you give him?

11  A.  Basically it depended on what he needed.  And I

12  would say an average maybe $125, $150 a week.  You know,

13  he'd ask his father for some money.  The agreement was

14  you go to school, you do the right thing, we will help

15  you 110 percent.  And he was doing that so we had no

16  problem giving him any money for anything he needed.

17  Q.  Didn't own a car?

18  A.  Didn't own a car.

19  Q.  Any other items that you saw, extravagant items that

20  he owned that he brought around the house?

21  A.  No.

22  Q.  During the week how often would you see him at the

23  house?

24  A.  Every day.

25  Q.  Did you know him to keep clothing at Cabot Street?

PDF created with pdfFactory trial version www.pdffactory.com

1    A.   No.

2    Q.   When -- on the couple of occasions that you did go

3    to Cabot Street, who would you see there, if you

4    remember?  This is prior to him being arrested.

5    A.   I've seen Renee's children, which was Shenai,

6    Darius, Daquon, Denari.  I've seen her brother Aaron

7    there because he lived there and his girlfriend, and

8    they have two little girls.  I don't know their names,

9    but I've seen them there.  And she has a brother Wayne.

10   I've seen him there.  I've met all of them.  They do

11   know me.

12   Q.   And you've -- you've seen them there from time to

13   time at that house?

14   A.   Yes, I have.

15   Q.   Is this before he was arrested on January 20th, 2005

16   or after he was arrested?

17   A.   Before.  And I've seen them after, too.

18   Q.   Would you describe how old Aaron Heywood is.

19   A.   Aaron Heywood, to describe him I would think he was

20   either in his late 20s, maybe about 27, 28, something

21   like that.

22   Q.   What about Wayne Heywood?

23   A.   He appeared to look older, and I don't know if it's

24   because of his lifestyle.  He's, you know, like homeless

25   and he has a lot of facial hair and dreads all over the

PDF created with pdfFactory trial version www.pdffactory.com

1    place.  It's kind of hard but he looked like he was

2    probably in his 30s, too.  It's really kind of hard to

3    describe, to give an age thing, because it looked like

4    he's been through a lot.

5            MR. KROWSKI:  If I might have just one brief

6    moment, your Honor.

7            (Pause.)

8    BY KROWSKI:

9    Q.  Did you ever see your son driving a Mazda MPV van?

10   A.  No.

11   Q.  Again, would you describe what kind of cars that you

12   did own that he would take?

13   A.  A Kia and a Camry.

14   Q.  Is that a Kia, K-I-A?

15   A.  Yes.

16   Q.  How would you get to work if he took one of the

17   cars?

18   A.  I'd drive my State Police cruiser.

19   Q.  Prior to him being arrested on January 20th, 2005,

20   would he call you from Renee Heywood's house?

21   A.  Yes, he has.

22   Q.  Do you remember Renee Heywood's number?

23   A.  No.

24   Q.  Do you remember what it would show up as on your

25   caller ID?

PDF created with pdfFactory trial version www.pdffactory.com

```
 1    A.  Only time I recall -- I never really look at my
 2    caller ID when I'm on the phone.  So I really can't
 3    say.  I talk on the phone.  I'm not so with phones.
 4    Q.  You had those conditions with Paul, correct?
 5    A.  Yes, I did.
 6    Q.  And those conditions were that he go to school?
 7    A.  Yes, it was.
 8    Q.  And go to school every day?
 9    A.  Every day.
10    Q.  And in your presence, your personal knowledge, did
11    he get up and go to school every day?
12    A.  He went to school every day.  He did all the things
13    he was supposed to do, changing his life.  And that's
14    why he could stay at our house, and that's why me and
15    his father would stand behind him.
16              MR. KROWSKI:  I don't have any further
17    questions, your Honor.
18                        CROSS-EXAMINATION
19    BY MR. MITCHELL:
20    Q.  Good morning, Mrs. Hicks.
21    A.  Good morning.
22    Q.  Mrs. Hicks, my name is John Mitchell, and I
23    represent the United States in this case.  I just have a
24    few quick questions up front.
25        It's fair to say that you're here to support your
```

1    son today?

2    A.  Yes, I'm here to support what's right.

3    Q.  Well, you certainly care about your son an awful

4    lot.  Isn't that fair?

5    A.  Yes, that's fair.  I care about all my sons.

6    Q.  And you -- I'm sorry, I cut you off.  You love all

7    your children, correct?

8    A.  Yes, I do.

9    Q.  And all your grandchildren?

10   A.  Yes, I do.

11   Q.  And you were deeply concerned about your son Paul

12   when he was released from incarceration in 2004,

13   correct?

14   A.  Yes, I was.

15   Q.  So you took him into your home?

16   A.  Yes.

17   Q.  And you supported him with a significant amount of

18   money, $125, $150 a week, correct?

19   A.  Yes.

20   Q.  And that was to put him -- that was your effort to

21   put him back on his feet?

22   A.  Yes.

23   Q.  And that was a significant commitment on your part,

24   right?

25   A.  Yes.

1    Q.  You have seven children, 17 grandchildren, all your

2    own bills, but you saw fit to support him in a

3    significant way; isn't that right?

4    A.  Well, I wouldn't say it was to suffer because I

5    could afford to help him out.  All my seven children are

6    grown.  My youngest child is 32.  My 17 grandchildren,

7    they have mothers and fathers, and I do help them as

8    much as I can any time I can.

9    Q.  Right.  But you don't have that kind of money to

10   give out to each and every single one of them, each of

11   your seven children and each of your 17 grandchildren,

12   fair to say?

13   A.  Not to each and every -- if I worked a lot of

14   details and I made my husband work a lot of overtime,

15   maybe we could.

16   Q.  And you do that because you're committed to your

17   kids, to your family; isn't that right?

18   A.  Yes, I am committed to my children.

19   Q.  You're not doing that to enrich yourself?

20   A.  No, no, not to enrich myself.  I enrich myself when

21   I see them in good health and well being and they're

22   doing the right thing.

23   Q.  And you realize that a conviction in this case could

24   have significant consequences; isn't that right?

25   A.  Oh, I realize that when my -- any conviction has

PDF created with pdfFactory trial version www.pdffactory.com

1    severe consequence to anybody.

2    Q.  And you don't want any harm to come to Paul, correct?

3    A.  Correct.  I don't want harm to come to him or

4    anybody.

5    Q.  In fact, you showed your concern for him in this

6    case immediately upon his arrest; isn't that right?

7    A.  Say that again?  I'm not understanding that

8    question.

9    Q.  Do you recall the search conducted at 15 Cabot

10   Street on January 20th, 2005?

11   A.  I recall the arrest that was taking place, but I

12   wasn't there for no search.  I wasn't -- I went there --

13   when I went there, I went there to remove the children

14   that were there.  I had no clue of what they have

15   already done or what they were doing because they just

16   made you go in and leave.  You couldn't do nothing.  You

17   couldn't say nothing.  They said don't say nothing, just

18   go in and get the children.  That's what I did.

19   Q.  You received a phone call, did you not, that -- that

20   evening that Paul was in trouble; isn't that right?

21   A.  No, I was on my way to Cabot Street with my other

22   son that I just came from the hospital with because he

23   was from Atlanta and we were going to see Paul.  And I

24   found out he was over Renee's house baby-sitting, so

25   that's where I was en route to.

PDF created with pdfFactory trial version www.pdffactory.com

1    When I called there, a sergeant answered the phone

2    and I thought I had the wrong number.  He said this is

3    Brockton Sergeant -- I can't even remember his name.

4    And I said, oh, I must have the wrong number.  He said

5    oh, no, you don't.  And I was almost like to her house

6    at that time so when we pulled up, they were there.  And

7    I got out and that's when I knew that was going on.

8    Q.  You've been aware of the issues in this case from

9    the start; isn't that right?

10   A.  What you mean aware of the issues?

11   Q.  Well, you've discussed this case with your son,

12   correct?

13              MR. KROWSKI:  Objection to that, your Honor.

14              THE COURT:  Overruled.

15   Q.  Have you discussed this case with your son, ma'am?

16   A.  Recently.

17   Q.  Just recently?  When did you first discuss it with

18   him?

19   A.  I'd say a few months ago.

20   Q.  You never spoke to him before that?

21   A.  I spoke to him before that.

22   Q.  So a few -- about the case?

23   A.  Not about the case.  About his situation, that he

24   didn't know why this was being done to him, what was

25   happening.  And I was just telling him --

1   Q.  I'm not asking you what you said --

2            MR. MITCHELL:  Move to strike the hearsay,

3   your Honor.

4            THE COURT:  I'll strike the -- well, yeah,

5   I'll strike it.  I'll strike it.  It was beyond the

6   scope of the question and it would be hearsay.

7   BY MR. MITCHELL:

8   Q.  Ma'am, just please listen to my question.  I'm

9   asking you when was the first time you discussed this

10  case with your son?

11  A.  I said a few months ago when I knew it was coming

12  around for him to go to court.

13  Q.  So he's been under arrest -- he was arrested in

14  January of 2005, which was, what, over a year and a half

15  ago, correct?

16  A.  Yes.

17  Q.  And you just -- you, a state trooper, mother of this

18  man, discussed this case for the first time with him

19  just a few months ago?

20  A.  Yes.

21  Q.  Do you remember telling the grand jury something

22  different from that?

23  A.  No.  What I can recall -- can you recall what I told

24  them?

25            MR. MITCHELL:  May I have a moment, your

```
 1   Honor.
 2              (Pause.)
 3   BY MR. MITCHELL:
 4   Q.  I'm going to show you your grand jury testimony,
 5   page 11.  Could you read this to yourself and tell me
 6   whether your memory was refreshed as to whether you'd
 7   spoken to your son.
 8   A.  As I read this --
 9   Q.  Just let me ask you does it refresh your
10   recollection whether you spoke to your son before your
11   grand jury testimony in July of 2005?
12   A.  Yes, the recollection that I did speak to my son,
13   but it ain't recollection that I discussed his case with
14   him.  I asked him what was his charges were.
15   Q.  Again, ma'am -- so you asked him what his charges
16   were?
17   A.  Yes.
18   Q.  So you spoke to him about the case?
19   A.  Yeah, but we didn't discuss the case.  I asked
20   him -- I didn't know nothing about the case and he
21   didn't either.  He knew what he was charged with and
22   that's what I was trying to find out from him, what he
23   was charged with.  We did not discuss the case like what
24   this is all about.
25   Q.  Okay.  Did you discuss the evidence in the case?
```

1    A.  I asked him what was his charges, yes.

2    Q.  Did you ask him whether it was his ammunition or

3    drugs in the case?

4    A.  He -- I didn't have to ask him.  He was already

5    saying it wasn't his.  I didn't even have to ask him.

6    Q.  So you discussed it with him, didn't you?

7    A.  What are you calling "discussed"?

8    Q.  You discussed this matter.  You discussed whether he

9    was --

10   A.  I discussed his charges with his arrest.  If you

11   call that, yes, then I did.  If that's what you're

12   calling we discussed, then that's what I did.

13   Q.  So you consider discussing the charges in the case

14   discussing this case, correct?

15   A.  No, you are.  I did not decide that discussing his

16   charges and him stating his charges what he was arrested

17   for to me was discussing the case of what happened in

18   that house that day.

19   Q.  And you talked to him -- you talked to him before

20   you appeared in the grand jury that day about whether

21   the ammunition and drugs were his, correct?

22   A.  He told me it wasn't his.  I didn't have to ask him

23   was that his.

24   Q.  That's not my question.

25   A.  That is your question.  You asked me did I say to

PDF created with pdfFactory trial version www.pdffactory.com

1    him was that his ammunition or his drugs that was in the

2    house.  I asked him, "What are your charges?"  And he

3    told me and then he said, "Ma, they're not even my

4    things, I don't even know why they're doing this."

5          MR. MITCHELL:  Your Honor, may I have the

6    question read back, the last question.

7          THE COURT:  I'm not sure which question you

8    want because it goes back a ways.

9          MR. MITCHELL:  No, two questions ago.

10         THE COURT:  Well, go ahead if you can find it,

11   Shelly.

12         (Question read back.)

13   A.  I didn't talk to him the day before I went to the

14   grand jury.  Say that again?

15         MR. MITCHELL:  Could you repeat the question

16   again, have it read back again?

17   A.  Let me hear it again because things get twisted in

18   here sometimes.

19   Q.  I'll ask it again.  Before you appeared in the grand

20   jury, did you discuss with your son whether the

21   ammunition and drugs were his?

22   A.  You could say yes if you want to put it he discussed

23   with me.

24   Q.  I'm asking you, ma'am.

25   A.  But I'm telling you how it went.  You keep telling

PDF created with pdfFactory trial version www.pdffactory.com

1  me -- coming back with did I discuss.  We had a

2  conversation, but to discuss something to a certain

3  length to me is a discussion.  To ask somebody how are

4  you today and they tell me they're fine, that's not a

5  discussion as far as we discussed something.

6  Q.  The first time the subject matter in this case came

7  up wasn't a few months ago, correct, ma'am?  It was

8  actually far longer ago, wasn't it?

9  A.  Well, for this case and to discuss this case was a

10  few months ago when I talked to his lawyer, and Paul

11  talked more about his case, that he's getting ready to

12  go to trial.  That's when we started discussing his

13  case.  That's when we had discussion.  I tell him, well,

14  your lawyer's working with things, the evidence, your

15  evidence.  You know, it all just come into play.  I had

16  no real big discussion over the legal situation here

17  because that's why he has a lawyer.  I don't discuss.

18  But if you want to say that was being discussed so we

19  won't keep running around in circles here, I discussed

20  with Paul.

21  Q.  Ma'am, you're a state trooper?

22  A.  Yes, I am.

23  Q.  Your son is under federal indictment?

24  A.  Yes, he is.

25  Q.  And it's your testimony that just a few months ago

PDF created with pdfFactory trial version www.pdffactory.com

1    you discussed this case for the first time with him?

2    A.  Yes, discussed it.  I mean, when you don't know

3    what's going on, how do you really discuss except for

4    your emotion of what's happening to you?

5    Q.  Okay.  You have -- you've discussed this matter with

6    Mr. Krowski, too; isn't that right?

7    A.  Yes, I have.

8    Q.  How many times have you talked to Mr. Krowski about

9    this case?

10   A.  I would say three --

11             MR. KROWSKI:  Objection.  Can we have a

12   sidebar?

13             THE COURT:  No.  Overruled.

14   BY MR. MITCHELL:

15   Q.  Three times?

16   A.  No, three or four times I discussed it.

17   Q.  When was the first time?

18   A.  That was a few months ago.

19   Q.  All right.  Do you know who's paying your son's

20   legal bills?

21             MR. KROWSKI:  Well, objection to that, your

22   Honor.

23             THE COURT:  Sustained.

24   Q.  Well, I'll ask you this:  Are you paying your son's

25   legal bills?

1    A.   Yes, I am.

2    Q.   So you care to see a positive outcome from this case

3    from a financial standpoint, too; isn't that right?

4    A.   Not from a financial standpoint.  I want what's

5    right and what's wrong for what's going on here.

6    Q.   You're willing to foot the bill for his defense

7    because you love him; isn't that right?

8    A.   No, because I have to know he's innocent or not

9    guilty.  I don't make him guilty before I flip a bill.

10   I don't say my son is guilty.  I am a state trooper, and

11   I don't know all the facts and circumstances.  No, I

12   wouldn't.  I thought he was innocent until proven

13   guilty.

14   Q.   You're aware, are you not, that your son was

15   convicted of possession with intent to distribute

16   cocaine in Plymouth Superior Court in 1996; is that

17   correct?

18   A.   Yes, I am aware he was incarcerated.

19   Q.   Okay.  Same Paul Hicks, right?  No confusion?

20   A.   No confusion, same Paul Hicks.

21   Q.   And he's the same Paul Hicks that was convicted

22   in -- also in Plymouth District Court in 1996 of

23   possession with intent to distribute cocaine?  Same Paul

24   Hicks, correct?

25   A.   Same Paul Hicks.

1    Q.  And he's the same Paul Hicks who was convicted of

2    manufacturing, distributing, dispensing cocaine in 1991

3    in Dorchester District Court, correct?

4    A.  Same Paul Hicks.

5              MR. MITCHELL:  Your Honor, may I approach?

6    There's a question I'd like to vet with the Court.

7              THE COURT:  All right.

8              (Conference at sidebar commenced.)

9              MR. MITCHELL:  I'd like to ask her a series of

10   cross-examination questions that go to her bias, her

11   bias specifically against the U.S. Attorney's Office and

12   the ATF.  The basis of that, those questions, would be

13   right now she has two other sons who are pending

14   indictment in this courthouse on separate cases.  And I

15   want to ask her whether --

16             THE COURT:  What do you mean pending

17   indictment?

18             MR. MITCHELL:  She has two other sons, Dwayne

19   Hicks and Dana Hicks, who are under indictment in this

20   court.

21             THE COURT:  Under indictment?

22             MR. MITCHELL:  Yeah, under indictment right

23   now.  I want to ask her whether she -- as she testifies

24   here today does she -- essentially whether she has --

25   whether she has an ax to grind against our office

PDF created with pdfFactory trial version www.pdffactory.com

1    because she has three sons indicted by this office.

2             MR. KROWSKI:  I don't know how that would

3    survive the 403 analysis.  What's the probative value?

4    It's pretty clearly established that she's the mother,

5    she loves her son, there's an inherent bias there.  To

6    now bring in criminal charged conduct of siblings --

7             THE COURT:  I'd exclude it under 403.

8             (Conference at sidebar concluded.)

9    BY MR. MITCHELL:

10   Q.  Mrs. Hicks, isn't it true that your son and Renee

11   Yarrell actually had a very close relationship in

12   January of 2005?

13   A.  Yes, they had a close relationship.  As close as

14   girlfriend and boyfriend.  I mean, I don't think they

15   were getting ready to get married or anything but...

16   Q.  Well, do you recall that -- you mentioned on direct

17   that you had actually visited her house on a few

18   occasions, correct?

19   A.  Yes.

20   Q.  And before your son started going out with her, you

21   didn't know her, correct?  That was your testimony,

22   wasn't it?

23   A.  No, I met her at my daughter's house.  I met her

24   with my daughter before I met her with my son.

25   Q.  But you didn't get to know her until they were going

PDF created with pdfFactory trial version www.pdffactory.com

1    out; isn't that correct?

2    A.  That's correct.  I got to see more and hear more of

3    her after that.

4    Q.  And you were invited over -- she invited you over to

5    her house; isn't that right?

6    A.  Well, it was more of I had to pick up something from

7    her because she helped me with a situation.

8    Q.  You said you'd been over there a few times?

9    A.  Yes.

10   Q.  So you were familiar with the house, correct?  You

11   were asked about that, weren't you?

12   A.  Yes, I am familiar with the house.

13   Q.  And she had been to your house; isn't that right?

14   A.  Yes, she had.

15   Q.  In fact, she had taken the time to help you out with

16   some matter at your house?

17   A.  Yes.

18   Q.  And, in fact, you were so close to her that your

19   first instinct when you learned that there was an arrest

20   at that house on January 20th was to take care of her

21   children, wasn't it?

22   A.  Wasn't my first instinct.  My instinct when I asked

23   was the children in there, they were concerned for

24   someone to take the children and I told them I would

25   take the children.

PDF created with pdfFactory trial version www.pdffactory.com

1    Q.   You appointed yourself to be the temporary custodian

2    of those children.  Isn't that fair to say?

3    A.   Yeah, that's fair to say.  But someone had already

4    came, a friend of hers came and took the children.  I

5    didn't have to take 'em.  I never took 'em.

6    Q.   These are children you knew?

7    A.   Yes, I know them.

8    Q.   And you saw fit to step in because you felt yourself

9    to be an appropriate person to care for those children?

10   A.   Yes, and take them away from that situation of what

11   was going on in there because I know that's not good for

12   children.  And I'd do that with anybody's children, not

13   just particularly hers.  I'm a mother.

14   Q.   Well, you don't just randomly walk on to search

15   sites and take care of the children who happen to be at

16   a search site, do you?

17   A.   Say that again?

18   Q.   Once again, you don't -- this isn't something you do

19   often.  That is to say, you go to a site where a search

20   warrant is being executed and care for the children who

21   might be at that site, correct?

22   A.   I didn't know beforehand the search warrant was

23   being executed.  I was going there and when I got there,

24   that's what was going on.  And to me the right thing to

25   do was to get the children out of that kind of situation

PDF created with pdfFactory trial version www.pdffactory.com

1    and let them do whatever they were doing.

2    Q.  You thought it was appropriate to care for those

3    children because, in part, you knew Renee well enough to

4    do that.  Isn't that fair to say?

5    A.  Not because I knew her well enough.  It was just the

6    right thing to do.  It didn't cross my mind, oh, these

7    are Renee's children, let me take them because I'm going

8    to care what Renee's feeling, no.  Renee wasn't even

9    there.  Renee was at work.

10   Q.  You weren't a complete stranger to these children?

11   A.  No, no.

12   Q.  Now, you were asked some questions by Mr. Krowski on

13   direct about who was living at that house, correct?

14   A.  Who I seen at that house.

15   Q.  Well, his question was -- you said -- you said

16   specifically on direct, did you not, that certain people

17   were living at that house?

18   A.  Yes, and the people I said do live at that house.

19   Q.  Okay.  And you know that because of your visits

20   there.  Is that your testimony today?

21   A.  No, because Renee said they lived there.  And when I

22   went there, they were there.  So I assumed they do live

23   there.

24   Q.  Well, are you aware -- Aaron Heywood was one of the

25   names mentioned, right?

PDF created with pdfFactory trial version www.pdffactory.com

1    A.  Say that again?

2    Q.  Aaron Heywood was one of the names you were asked

3    about?

4    A.  Yes.

5    Q.  Were you aware in January 2005 Aaron Heywood was

6    actually living at 6 West Street, Brockton?

7    A.  No, I wasn't aware.

8    Q.  Do you know that's what he told the Brockton Police

9    Department?

10                   MR. KROWSKI:  Objection.

11   A.  No, I don't know whether --

12                   THE COURT:  Overruled.

13   A.  I don't know his lifestyle.  I don't know all about

14   him or what he does on them.  I would have no idea.

15   Q.  But you testified he lived in that house; isn't that

16   right?

17   A.  Yes, but I didn't say on that date.  I didn't know

18   if he lived there then.  I have no idea.  But I know he

19   lived there to my knowledge.  I didn't know if he was

20   still living there.  I don't know how long he was living

21   there.  I didn't know how long he lived there before I

22   knew Renee.  I don't know.  But I know he has lived

23   there.  He lived there with his mother, too.

24   Q.  So your testimony is on January 20th, 2005 you don't

25   know whether he was living there?

1    A.   January 2005?

2    Q.   January 20th, 2005 when that arrest was made --

3    A.   No, I don't know if he was living there on that day

4    that arrest was made.

5    Q.   Okay.  You were asked --

6              MR. MITCHELL:  May I have a moment, your

7    Honor.

8              (Pause.)

9    Q.   One of the other names that you mentioned was Wayne

10   Heywood; isn't that right?

11   A.   Yes.

12   Q.   Are you aware that in that same time period that a

13   restraining order was in effect against Wayne Heywood

14   such that he was not allowed legally to go near that

15   house?

16   A.   No, I didn't know if it was at that period.  I've

17   known of them to have a restraining order on him, and

18   he's broken it a number of times because they had to

19   call the police to get him out of there.  Because she

20   would call, he's in here, writing things on the wall.

21   He was like a little distraught, pasting stuff, stopping

22   up the toilet.  You know, I'd hear things like that just

23   through the conversation.

24        But the period of time, I really couldn't put dates

25   with them.  You know, I don't know when the restraining

PDF created with pdfFactory trial version www.pdffactory.com

1    orders were going to end or when they began.  And I know

2    they'd call the police and they'd remove him.  I just

3    knew basically like that.  I don't know at what times.

4         It was none of my business really.  It wasn't like I

5    was to know all that with them for any reasons.  It's

6    just people saying their situations, and I am a person

7    people talk to a lot.  You know, whenever something's

8    going wrong, you know, I just listen to her.  If she

9    said her brother was by and he did this and my kids are

10   afraid so I'm going to call the police or something.

11   You know, in that respect.

12   Q.  Okay.  So to your knowledge, he was -- she would

13   have him removed from that house when he was violating

14   the restraining order which was in place at that time,

15   fair to say?

16   A.  If he got violent.  If it was cordial, she'd let him

17   stay, even though she wasn't going to see him.  If he

18   was taking medication or something, he could stay.  You

19   know, I don't know like the times he could stay and he

20   couldn't because I didn't really know when the

21   restraining orders were in effect and they wasn't, if

22   they were overwith and she had one before.  I really --

23   but I know there was -- that was involved in some

24   periods of time, that she had a restraining order on

25   him.  When he was there at that period, I do not know.

PDF created with pdfFactory trial version www.pdffactory.com

1    I don't know.  I don't know nothing about the length of

2    the restraining order or anything.  I've heard it

3    mentioned that she's had one, she's gotten one before.

4    You know, just through a conversation.  Because he was

5    driving her and her kids in an uncomfortable situation.

6    And she loved her brother, but he was just doing things

7    there that they didn't feel safe, the kids didn't feel

8    comfortable, and she said she had to do something.  She

9    thought they'd put him in a home or something.  I mean,

10   I don't know what was supposed to be the outcome because

11   I never followed up on it.

12   Q.  Okay.  Fair to say that Mr. Heywood's severely

13   mentally ill?

14   A.  I wouldn't say severely.  I don't know him that well

15   to even say that.  I ain't a doctor.

16   Q.  You characterized him as having dreadlocks and --

17   A.  Yeah, and he was homeless.  Just because you're

18   homeless doesn't mean you're severely ill.  You might be

19   having a hard time, that you look at things different.

20   That doesn't mean he's severely ill.  He could hold a

21   conversation with you.

22   Q.  He's a schizophrenic, right?

23   A.  I have no idea.  I have no knowledge of that, of his

24   being a schizophrenic.  You told me describe him and I

25   described him when you wanted to know his age.  It's

PDF created with pdfFactory trial version www.pdffactory.com

 1   hard to detect his age when someone looks like they've

 2   been through a lot of worry and whatever.  I couldn't

 3   say he was schizophrenic or seriously mentally ill or --

 4   it's not my place.

 5   Q.  Let me ask you about a couple of other names.

 6   Edward Robinson.  Do you know Edward Robinson?

 7   A.  Yes, I know a Edward Robinson.

 8   Q.  He's a friend of your son's?

 9   A.  Yes.

10   Q.  He's a friend of some of your other sons, correct?

11   A.  We all know him.

12   Q.  Yeah.

13   A.  Known him since childhood.

14   Q.  And you know him to have lived in January of 2005

15   down at Algonquin Terrace in Plymouth; isn't that right?

16   A.  I don't know where he lived either, to say an

17   address on him.  I have no idea.

18   Q.  He wasn't living at 15 Cabot Street; isn't that

19   right?

20   A.  Not to my knowledge.  I couldn't say that's where he

21   lived.

22   Q.  And Darius Yarrell, you met Darius?

23   A.  Yes, I have.

24   Q.  You mentioned Darius in your direct, didn't you?

25   A.  Say that again?

PDF created with pdfFactory trial version www.pdffactory.com

1    Q.   You mentioned Darius in your direct?

2    A.   In my direct?

3    Q.   I'm sorry, direct examination.  You mentioned

4    Darius --

5    A.   Yes.

6    Q.   -- as one of those people who lived at 15 Cabot

7    during sometime in the last couple years; isn't that

8    right?

9    A.   Yes.

10   Q.   And Darius is a college student at Framingham State,

11   isn't he?

12   A.   Yes, he is.

13   Q.   He's got his act together, fair to say?

14   A.   I don't think Darius had an act to get together.  He

15   was always a good kid.  What do you mean got his act

16   together?

17   Q.   That's exactly what I mean, he's a good kid.

18   A.   Yes, he is.

19   Q.   He's a college student?

20   A.   Yes, he is.

21   Q.   He's living on campus right now at Framingham State?

22   A.   Yes.  I don't know if he's living there, but he's in

23   Framingham State.

24   Q.   And others you mentioned living there are all small

25   children, correct?

PDF created with pdfFactory trial version www.pdffactory.com

```
1    A.  No.  His sister Shenai is older than him.  She's in
2    college, too.
3    Q.  She's a college student?
4    A.  Yes, she is.
5    Q.  Now, you remember Mr. Krowski asked you about based
6    on your experience as a state trooper you recognize
7    illegal contraband; isn't that right?
8    A.  Yes.
9    Q.  You've had training in narcotics investigations;
10   isn't that right?
11   A.  Yes.
12   Q.  And you realize that in searches of homes where
13   narcotics are found, what the police look for are
14   indicia of residency; isn't that right?
15   A.  Say that again?  Indition (sic) of residency?
16   Q.  Indicia of residency.  Evidence that someone that --
17   the people they think had the drugs were actually living
18   there.  Isn't that right?
19   A.  Yes.
20   Q.  Based on your training and experience as a state
21   trooper, is it more or less likely that a person who has
22   utility bills in his name at a location of a search
23   actually lives in that location?
24   A.  Well, that's not always the case.
25   Q.  That's not my question.
```

1   A.  Yes, with my experience as a state trooper, that's

2   not always the case because we found things to be in

3   people's names that people are not living there.  They

4   use fraud.  People do a lot of things.  As my experience

5   as a state trooper, we wouldn't just based on that that

6   we'd find something there.  We'd have to find out with

7   that person that applied, that did it, went through the

8   whole procedure for it to be there that that's them.

9   Q.  That wasn't my question, Mrs. Hicks.  My question

10  was this:  Is it more or less likely that if someone has

11  utility bills in his name is actually living at that

12  location?

13          MR. KROWSKI:  Objection to that, Judge.

14          THE COURT:  Sustained.

15  Q.  Based on your training and experience.

16          MR. KROWSKI:  Objection.

17          THE COURT:  Sustained.  Same question.

18  BY MR. MITCHELL:

19  Q.  Would you agree that a person -- that utility bills

20  in the name of a person at a location, at a suspect

21  location, indicates that the person lives there more

22  likely than not?

23          MR. KROWSKI:  Objection.

24          THE COURT:  Sustained.

25  Q.  Based on your -- based on your training and

PDF created with pdfFactory trial version www.pdffactory.com

1   experience, would the fact that someone had taken a
2   shower at a place be an indicium that that person
3   actually lived there?
4   A.  No.
5   Q.  It wouldn't?
6   A.  No.
7   Q.  Would a person who takes a shower at a location, at
8   someone's house, at a house, more likely than not be
9   someone who actually lives in that house?
10  A.  No, it wouldn't be.
11  Q.  It wouldn't?
12  A.  No.
13  Q.  What about if a person receives mail at a location,
14  at a house?  Would that -- would it be more likely than
15  not that that person actually lives at that house?
16          MR. KROWSKI:  Objection.
17          THE COURT:  Sustained.
18  Q.  Mrs. Hicks, how long you have been on the State
19  Police?
20  A.  Twenty-four years.
21  Q.  Okay.  And where were you employed before that?
22  A.  I was at home.
23  Q.  So you've been employed full time for 24 years?
24  A.  Yes, sir.
25  Q.  Was that entire time with the Massachusetts State

1    Police?

2    A.   Yes -- no, earlier was with the Metropolitan

3    Police.   Then they consolidated.

4    Q.   How long were you with the Metropolitan Police?

5    A.   Since 1983.  And then I -- they consolidated, I

6    believe was it in 1990 or '91.  Around that.  I really

7    don't remember the year, but it's been a substantial

8    time back that we consolidated.

9    Q.   Did you go to the State Police Academy?

10   A.   Yes, for retraining.  Yeah, we go there.

11   Q.   Did you take a full-time basic training State Police

12   Academy course?

13   A.   I don't know if the MDC, the Metropolitan Police, is

14   equivalent to theirs.  I believe so.  It's all a state

15   organization.  They all run the same.

16   Q.   Well, do you understand that state police -- in the

17   usual course state police troopers go through a

18   full-time training period for several months before they

19   actually are admitted on to the force?

20   A.   Yes, they do.

21   Q.   Did you go through that?

22   A.   I went through a full-time as much was expected.  I

23   call it full time.  I was there all the time with them.

24   I went to the capacity at the time that I never stood

25   away from it or was late or absent or anything.  I'm not

PDF created with pdfFactory trial version www.pdffactory.com

1    understanding what you're trying to get at with this.

2    Q.   Did you go through the usual state police basic

3    training course that all state troopers go through?

4    A.   I went whatever was required.  If they called --

5    when we consolidated, whatever training they bring us

6    into qualified us to be state troopers, that's what I

7    did.  I did exactly what policy and procedure did.

8    Whoever judges that, I have no idea.  I know I have a

9    badge, and I represent the state police.  And I'm a

10   state trooper.  How much more of that am I supposed to

11   be a state trooper whether I went to an academy?  I

12   didn't make myself a state trooper.  They made me a

13   state trooper.

14   Q.   I guess I'm just asking you to answer my question.

15   Did you go through the usual State Police Academy

16   training?

17   A.   No, I didn't have to because I was on the

18   Metropolitan Police.  I already had training.

19   Q.   All right.  So the answer's no?

20   A.   I would have to say I don't know if they call the

21   Metropolitan Police state training equivalent with State

22   Police.  I'm not -- I can't answer that question.  I

23   know they consolidated us and they thought so because

24   they made us state troopers.

25   Q.   When you're referring to consolidation, you're

PDF created with pdfFactory trial version www.pdffactory.com

1    referring to a law the legislature passed that abolished

2    the Metropolitan Police and took all those police

3    officers and stuck them in Massachusetts State Police,

4    correct?

5    A.   Yes.

6    Q.   So you and everyone else who was in Metropolitan

7    Police went over to the Massachusetts State Police?

8    A.   Yes.

9    Q.   You didn't have to go through all the training that

10   State Police troopers go through?

11   A.   No, we just had -- had to requalify at the State

12   Police Academy.

13   Q.   Okay.  So you've been with the State Police since

14   1990/'91, correct?

15   A.   Yeah.

16   Q.   And where have you been assigned during the last 15

17   years?

18   A.   South Boston, Troop H-6 barracks.

19   Q.   When were you there?

20   A.   I've been there since 1983.

21   Q.   So you've been there, so, 13 years?

22   A.   1983?  I would think -- yeah, I've been at South

23   Boston since 1983.  I never changed my barracks or my

24   station.  They changed that station into a State Police

25   barracks.  I've been there the whole time.

PDF created with pdfFactory trial version www.pdffactory.com

1  Q.  Okay.  Again, my question is since you joined the

2  State Police, where have you been?  Your answer is South

3  Boston; is that correct?

4  A.  Yes.

5  Q.  What did you do there?

6  A.  My present time I do drivers licensing.

7  Q.  How long have you been doing that?

8  A.  About ten years.

9  Q.  When's the last time did you a narcotics

10  investigation?

11  A.  I never did a narcotics investigation.  They have a

12  special unit for that.  I never did a narcotics

13  investigation.

14  Q.  When is the last time you participated in a search

15  warrant of a house where narcotics was found?

16  A.  I never did that either.

17  Q.  When was the last time you arrested somebody for

18  narcotics trafficking?

19  A.  Never.  I never worked on a narcotics unit.  I never

20  did that.

21  Q.  So when you -- when you said on direct with such

22  certainty that you knew what illegal narcotics looked

23  like, illegal contraband, you really haven't worked

24  those kinds of cases; isn't that right?

25  A.  I haven't worked them cases but they train us and

PDF created with pdfFactory trial version www.pdffactory.com

```
 1    they make us aware of illegal contraband and, you know,
 2    we do a lot of things.  Rape cases, I never worked one
 3    of them either, but they show us what to look for if we
 4    come across it because I can come across anything.
 5    Q.  You mentioned on direct that you have seven
 6    children, correct?
 7    A.  Correct.
 8    Q.  And one deceased?
 9    A.  One deceased, yes.
10    Q.  Seventeen grandchildren?
11    A.  Yes.
12    Q.  You work full time?
13    A.  Yes, I do.
14    Q.  Your husband works full time?
15    A.  Yes, he does.
16    Q.  Fair to say you have a lot going on in your life?
17    A.  Yes, fair to say.  I have a whole lot going on in my
18    life.
19    Q.  All right.  And you stated on direct that you had an
20    awful lot going on a couple of years back in 2003/2004.
21    Isn't that fair to say?
22    A.  I wouldn't say in 2003 to 2004 I had a lot going
23    on.  I had a lot of grief because I had lost my son and
24    I hadn't got over that, so I really was kind of out of
25    pinch, you know.  I didn't have a whole lot going on and
```

PDF created with pdfFactory trial version www.pdffactory.com

```
 1   I was trying to be -- I don't know if you ever lost a
 2   child to know what that does to your life, but it takes
 3   a lot of matter to don't matter because you don't know
 4   why, you know, God does what he does but you can't ask
 5   why.  And at that period of time, no, I was forgetting a
 6   lot of things, didn't know a lot of things.  I was being
 7   there, I still was functioning like everybody else, I
 8   ain't the only person in the world that ever lost
 9   anybody; but this one was mine and I lost him and he was
10   a twin.  And I look at his other twin and we -- yeah,
11   he's going through the same thing right now.  He's going
12   through the diabetes thing now, too.  I might lose him.
13   I might go through a lot.  I'm going through that.  I'm
14   going through my husband just has cancer.  We just got
15   that diagnosis.
16       So I go through a lot of things but I still go.  I
17   don't know how I go.  I think it's with the grace of
18   God.  But I go where -- I'm not going to not go if it
19   ain't the right thing to do.  I don't waste my time
20   because I don't have the time to waste.
21   Q.  I'm sorry that you have to testify about all this.
22   I know it's not easy.  And if you want a moment, we can
23   take a moment.
24       What I'm asking you, where I'm going with this,
25   Mrs. Hicks, is that with all this stuff going on in your
```

PDF created with pdfFactory trial version www.pdffactory.com

1    life, you really weren't keeping track day to day of

2    what Paul was doing in January of 2005 and late 2004.

3    Is that fair to say?

4    A.   I didn't have to keep track of Paul.  He's a grown

5    man.  He kept track of me more or less, I'd say, for the

6    situation I was in.  All my sons, they all reach out to

7    me because they know what I was going through and what

8    was being.  As I see them every day, I'd get a hug from

9    them every day, a kiss every day.  That I do know.  The

10   dates of it, no, I don't.  But them being there and me

11   seeing the right thing is all I was caring about in my

12   heart, not that on this day was he going to go see Renee

13   or on this day was, you know, Renee's brother -- I mean,

14   them all questions you have to ask me, I have no problem

15   with it.  But for me to rack my mind to say, oh, yeah, I

16   can remember on this day, no, I can't.

17        I remember September 15th, 2003 when my son died up

18   in Brockton Hospital.  That's what I remember.  And for

19   all the other stuff, I can do nothing but tell the

20   truth.  You know, really just start saying there's that,

21   you know, I can't organize it that well.  I'm just going

22   with the truth, and that's all I can do.  And that's all

23   I came here today to do was to put the truth.  Not that

24   I'm afraid of what would happen this way or what would

25   happen that way.  I only can do what I know and what's

1    right.  And that's how I live.

2        Other than that, I don't know what to say.  You

3    know, I really don't know what to say.  I mean, I don't

4    get into a whole bunch of that because my mind goes.

5    I'm hoping one day to see my son, that he'll come, I'll

6    see him in a dream.  I'm looking to see my son.  And you

7    want to know what's really deep in me?

8        So for me to have this great want to do this or do

9    that because I'm afraid, the only thing I know in life

10   today to be afraid of is losing one of your children to

11   death and you'll never see them again until I die.

12   That's my fear of anything on this earth.

13   Q.  You won't get any argument from me, Mrs. Hicks, on

14   that.  I mean, it's fair to say you've been carrying a

15   pretty big cross, correct?

16   A.  Fair to say.

17             MR. MITCHELL:  I don't have anything else,

18   your Honor.

19             THE COURT:  Redirect?

20             MR. KROWSKI:  No questions, your Honor.

21             THE COURT:  All right, Mrs. Hicks, thank you.

22   You may step down.

23             We'll take a recess.

24             THE CLERK:  All rise.  Court will take a

25   recess.

PDF created with pdfFactory trial version www.pdffactory.com

1              (Jury withdrew, 10:49 a.m.)

2              (Recess taken, 10:49 a.m.)

3              (Court resumed, 11:07 a.m.)

4         THE CLERK:  All rise.

5         THE COURT:  I'm told that --

6         MR. KROWSKI:  Mr. Hicks is not going to

7    testify.

8         THE COURT:  Is that the end of the evidence?

9         MR. KROWSKI:  The defendant would rest.

10        THE COURT:  I just wanted to hear you briefly

11   on instructions.  I have your instructions.  I will give

12   a form of each of them.  Other than that, we'll just

13   extend the break and come back, inform the jury that

14   we're in the next stage, which is instructions and

15   arguments and so on.

16        MR. MITCHELL:  A couple of things, your

17   Honor --

18        THE COURT:  If we're going to get substantive,

19   I would just ask Mr. Krowski whether you want Mr. Hicks

20   out for this.

21        MR. KROWSKI:  I don't know.  How substantive?

22        MR. MITCHELL:  I would like to get on the

23   record that he's been advised of his right to testify on

24   his own behalf.

25        THE COURT:  You mean from him?

```
1              MR. MITCHELL:  From the defendant himself.

2              MR. KROWSKI:  Or I could do it as an officer

3   of the court.

4              THE COURT:  He's thinking 225 is what he's

5   thinking.

6              MR. MITCHELL:  Yeah, I'd like that.  And,

7   secondly, as to the instructions, two things on the

8   instructions.  One is there's a forfeiture count in the

9   indictment for the cash that was sitting in the bedroom

10  closet.  I didn't submit any instruction on that, but

11  I'm sure the Court has standard forfeiture instructions.

12             THE COURT:  Well, are you going to submit that

13  count?  It would happen after the conviction, I think.

14             MR. MITCHELL:  I guess I would.

15             THE COURT:  Is it going to be a question of a

16  jury issue on that?

17             MR. MITCHELL:  I don't think so.

18             MR. KROWSKI:  No, your Honor.

19             MR. MITCHELL:  I guess I hadn't focused on it

20  that much.

21             THE COURT:  We just had it in the last trial

22  we did.  We got the verdict first and then the decision

23  was made whether or not we would go forward and submit

24  the forfeiture question to the same jury.  In that case

25  the defendant after the verdict on the substantive
```

```
 1    crimes decided that the forfeiture question could be
 2    decided by the Court.  And so we discharged the jury.
 3    That's what we did in the last one.
 4            MR. KROWSKI:  I have no problem with that.
 5    We've never claimed ownership of it, and I don't think
 6    there would be much vigorous opposition, your Honor.
 7            THE COURT:  Okay.
 8            MR. MITCHELL:  One other thing I just want to
 9    just make a brief oral motion in limine regarding
10    defense closing.  Specifically I would ask that the
11    Court exclude from defendant's closing argument that
12    because the -- he pleaded guilty in his three other
13    cases, he's not pleading guilty here, they should
14    believe that he's going to trial because he's actually
15    not guilty.  I think that's improper argument based on
16    those convictions.
17            MR. KROWSKI:  I'm not going to make that
18    specific argument.  I certainly -- it's probably fair
19    game I can comment what they can't consider based on
20    those convictions.  I mean, he's presumed innocent so
21    I'm not going to make an argument that shifts the burden
22    upon myself.  It's fair game that, look, you can't
23    consider because he has prior convictions that he's
24    guilty in this case.
25            THE COURT:  Right.  Sure.
```

PDF created with pdfFactory trial version www.pdffactory.com

```
 1              MR. KROWSKI:  That's certainly fair.

 2              THE COURT:  You're not going to make the

 3      argument --

 4              MR. KROWSKI:  That he pled once, he didn't

 5      plead this time so that must mean he's -- no.

 6              THE COURT:  All right.  Well, why don't we see

 7      if we can get him out and if you want, we'll put on the

 8      record he has been advised of his right to testify.

 9              (Defendant entered courtroom, 11:11 a.m.)

10              MR. KROWSKI:  We're ready, your Honor.

11              THE COURT:  Okay.  Mr. Hicks, your lawyer has

12      told me that you have discussed with him whether or not

13      you ought to testify on your own behalf, which of course

14      you have the right to do.  You have the right also not

15      to testify on your own behalf.  And he's told me that

16      after consulting that it's your decision not to -- that

17      you will not testify in the case.  Is that correct?

18              THE DEFENDANT:  Yes, your Honor.

19              THE COURT:  Okay.  And you've had a full

20      discussion with him and considered all the options one

21      way and the other and the implications of those

22      options?

23              THE DEFENDANT:  Yes, your Honor.

24              THE COURT:  And it is your decision?

25              THE DEFENDANT:  Yes, your Honor.
```

1          THE COURT:  All right, thanks.  We'll take a

2    recess now and we'll -- let me just to the lawyers, I'm

3    going to send in a copy of the indictment without the

4    forfeiture allegations.  That's just Counts One, Two and

5    Three.  And we have a -- if you want to take a quick

6    look at our -- there's one minor edit I have yet to the

7    verdict form.  If you want to make any suggestion on

8    that, it's pretty straightforward.

9          I think you know that my practice is to

10   instruct on the substantive elements of the offenses

11   before argument so the jurors have heard that by the

12   time you argue, and then I'll continue with the evidence

13   evaluation and so on and instructions after that.  So --

14          MR. MITCHELL:  No objections from the

15   government, your Honor.

16          MR. KROWSKI:  Defendant is satisfied for the

17   record.

18          THE COURT:  Okay.  I just have one question

19   about the -- most of the proposed instructions were all

20   pretty standard and including the standard instruction

21   under 18 U.S. Code Section 2 by the government.  I don't

22   see any reference to that theory or specific section in

23   the indictment.  So I don't propose to give that

24   particular.

25          MR. MITCHELL:  Yeah, I went back and looked.

PDF created with pdfFactory trial version www.pdffactory.com

1    All I can say is it wasn't my case originally, your

2    Honor.

3                THE COURT:  All right.

4                MR. KROWSKI:  I agree, your Honor.

5                THE COURT:  We'll take about a 15-minute break

6    and then we'll call the jurors in and I'll begin with

7    the instructions and so on.

8                THE CLERK:  All rise.  Court will take a

9    recess.

10               (Recessed, 11:15 a.m.)

11               THE CLERK:  All rise for the jury.

12               (Jury entered courtroom 11:44 a.m.)

13               THE CLERK:  Please be seated.

14               THE COURT:  Jurors, the evidence is

15    completed.  Now we're going to proceed to the next stage

16    of the case, include my instructions about the law and

17    the lawyers' closing statements to you.  And when that's

18    done, we'll ask you to deliberate upon the evidence and

19    return with a verdict.

20               This responsibility that I have to instruct

21    you in the law is an important part of what I am here

22    for.  Part of it is to preside over the trial obviously

23    and make those legal rulings that are necessary as we go

24    through the presentation of the evidence.  But now at

25    this point in the case when you've heard all the

PDF created with pdfFactory trial version www.pdffactory.com

1    evidence, to give you some guidance of some principles

2    of law that apply to the matters you're going to have to

3    decide, that is, whether the government has proved the

4    charges that are made in the indictment or not and also

5    some instructions to you about how you ought to go about

6    evaluating the evidence and coming to your conclusions.

7            So I'm going to divide my instructions really

8    into two parts.  First I'm going to talk about those

9    principles or propositions that the government must

10   prove by the evidence in order to establish that the

11   defendant is guilty of any or all of the charges in the

12   indictment.  After I've given you those instructions

13   about, in effect, what constitutes the crime, what facts

14   must be proved in order to prove the crime, after I've

15   done that, the lawyers will have their opportunity to

16   argue in their closing statements about how you ought to

17   evaluate the evidence and presumably come to a

18   conclusion that they would propose.  When they finish

19   that, I'll have some more to say to you about your

20   evaluation of the evidence and your deliberations.  So I

21   get the first and the last word.

22           Now, it's my responsibility to set forth these

23   principles of law that apply fully and accurately,

24   without regard to any personal or private views that I

25   might have about the wisdom or prudence of any of these

PDF created with pdfFactory trial version www.pdffactory.com

 1    principles or whether there could be different or

 2    additional principles that could be applied in the

 3    circumstances, but rather to tell you faithfully what

 4    the law is with respect to these matters.  You have a

 5    similar duty to accept and apply these principles fairly

 6    and sensibly to your deliberations, again, without

 7    regard to any personal or private views you might have

 8    about whether there could be different or additional

 9    principles that could be brought to bear but accept that

10    these are the principles that do apply and should guide

11    your deliberations.  So, in a sense, you can think of

12    these instructions as a short course in all the law you

13    will need to know in order to decide this case.

14            Your responsibility is twofold.  First of all,

15    you resolve the factual issues in the case, what is

16    true, what is proven by the evidence about the facts of

17    the case.  What happened historically in fact.  And once

18    you've decided that, you consider those facts in the

19    light of these principles to see whether the government

20    has established what needs to be established in order to

21    convict the defendant or not.  So you have a

22    fact-finding function and then applying the law, the

23    legal principles to those facts after you resolve them.

24            So what I'm going to talk about now are the

25    legal propositions.  I'll come back to the fact finding

PDF created with pdfFactory trial version www.pdffactory.com

1    aspect a little bit later.  These are the legal

2    propositions and the government must prove, then, these

3    matters as a matter by the evidence.

4            Now, as I told you at the beginning, and I

5    think you perhaps have been reminded in the course of

6    the case, the indictment presents three counts.  The

7    first count alleges possession, that the defendant

8    having previously been convicted of a felony offense

9    unlawfully possessed ammunition in violation of United

10   States statute.  Second -- so you can think of the first

11   count as unlawful possession by a felon of ammunition.

12   Second count charges the defendant unlawfully possessed

13   more than five grams or five grams or more of cocaine

14   base or crack cocaine with the intent to distribute it.

15   The third count charges the defendant unlawfully

16   possessed a quantity of cocaine, that is powder cocaine,

17   not crack cocaine, with the intent to distribute.

18           Let me go through each of those in some --

19   break down each of them into the separate propositions

20   or sometimes we call them elements of the offense that

21   the government is required to prove.

22           One element of each offense, one element that

23   is common to each offense, is the notion of possession.

24   In each case the defendant is charged with possessing

25   something that is unlawful or in an unlawful way.

1          To "possess" something for these purposes

2    means to have both the ability and the intention to

3    exercise authority, dominion or control over that

4    thing.  That is, possession can be said to have occurred

5    or to occur when a person has both a subjective

6    intention to exercise control over an item and an

7    objective ability to do so.  So it's the coincidence of

8    the intention to do so and the ability to do so at the

9    same time.

10          Now, possession may have -- may occur when

11    someone has actual direct physical control over an

12    object.  You're actually holding on to something.  If I

13    pick up one of my books and hold on to it, obviously I'm

14    in possession of it.  You don't have to be actually in

15    direct physical possession of something in order to

16    possess it for purposes of the law.  I'm still in

17    possession of that book even though I'm not touching it

18    because I have right now the ability and intention to

19    exercise control over it.  As a matter of fact, I am in

20    that sense in possession of those books that are in my

21    office in another part of the building because I intend

22    and have the ability to exercise control over them.  So

23    when we talk about something that is not actual, direct

24    physical contact, we sometimes call it constructive

25    possession to distinguish it from actual possession; but

1    either kind is possession.  The hallmark is is there a

2    coincidence, a simultaneous coincidence, of both the

3    intention to exercise control over it and the ability to

4    do so.

5            Possession is not the same as ownership.  A

6    person can possess something without owning it.  For

7    example, the books here and in my office belong to the

8    court, not me, but I'm in possession of them.  Just as

9    if you go to the public library and take a book out, the

10   book still belongs to the library but you're in

11   possession.  So ownership is not the question but

12   possession.

13           Possession does not have to be exclusive.  It

14   can be shared by more than one person.  An object can be

15   simultaneously, in a sense, possessed, perhaps not

16   directly unless you have both people hanging on to it

17   but certainly constructively can be simultaneously

18   possessed by more than one person.  I'm sure you can

19   think of examples in your daily lives of how you share

20   possession of things with people.  Sometimes you may

21   think you share possession of the remote control for the

22   TV, and sometimes you may want to have exclusive

23   possession of it.  But, in any event, either satisfies

24   the question of possession.

25           So that's a common element that runs across

1    each of the three counts, and the government will have

2    to prove by the evidence beyond a reasonable doubt that

3    the defendant possessed the particular item in each

4    charge in accordance with those meanings or that meaning

5    of what possession is.

6           Now, the first count charges the unlawful

7    possession of ammunition by a felon.  There's a federal

8    statute that makes it unlawful for a person who has

9    previously been convicted of a felony, that is, an

10   offense punishable by imprisonment for more than one

11   year, a person who has been so convicted may not possess

12   ammunition under this federal statute.  So the offense

13   is proved if a person possesses ammunition having

14   previously been convicted of a felony.

15          The person -- the government must prove the

16   person knowingly possessed the ammunition.  "Knowingly"

17   means that the act is done voluntarily and intentionally

18   and not because of a mistake or accident.  So you

19   must -- you may find that an act was done knowingly if

20   the person realized what was going on, realized what he

21   was doing, what he was in possession of and didn't act

22   through ignorance, mistake or accident.  So knowingly is

23   an element of the offense.

24          "Ammunition" for these purposes is defined by

25   a federal statute and it includes any ammunition or

1    cartridge cases, primers, bullets or propellant powder

2    designed for use in any firearm.  That's the statute

3    definition of ammunition.

4              The law applies to someone who has, as I told

5    you previously, been convicted of a felony under either

6    federal or state law.  That includes punishment -- that

7    provides for punishment for a term exceeding one year.

8              Now, I've referred to the element of

9    "knowingly possessed."  In order to decide what somebody

10   knows, we can't obviously look into their head and read

11   the screen and see what they're thinking or knowing.

12   How do you tell what somebody knows?  Well, you may be

13   able to infer knowledge from all the attendant

14   circumstances.  The way the person acts or behaves,

15   perhaps from other circumstances, including how others

16   may behave in connection with the person that you're

17   wondering about.  You may consider the circumstances as

18   you find them to have been shown in the evidence and

19   decide whether that shows knowledge of any particular

20   fact on the part of the defendant.

21             There's one final element of this offense and

22   that is that the item possessed, the ammunition, must

23   have been connected in some way with interstate

24   commerce.  You heard some evidence about that.  You may

25   have been wondering about that.  This actually is to

PDF created with pdfFactory trial version www.pdffactory.com

1    satisfy what we call a jurisdictional requirement.

2    Congress has the power to regulate interstate commerce,

3    and it is pursuant to that power that Congress enacts

4    various provisions, including criminal laws, but

5    Congressional power is limited to those matters that

6    travel in interstate commerce.  So in order to give

7    federal jurisdiction over a matter, it must be shown

8    that the matter affects interstate commerce.  This means

9    basically that the government must prove that the item

10   at issue here, the ammunition, moved from one state to

11   another at some point in time.  It's not necessary to

12   show there's a substantial economic effect on interstate

13   commerce, but simply that there was some connection with

14   interstate commerce involving the ammunition.  And

15   moving from one state to another would satisfy that

16   element.

17            So in order to prove this offense against the

18   defendant, the government must prove beyond a reasonable

19   doubt that he possessed, as I defined that for you,

20   ammunition, as I defined that, that had a connection

21   with interstate commerce; that when he did so, he had

22   been previously convicted of a felony, that is, a crime

23   punishable by imprisonment for one year or more -- for

24   more than one year; and third, that he did so knowingly,

25   knowing that what he was doing was possessing

PDF created with pdfFactory trial version www.pdffactory.com

 1    ammunition.  It's not necessary to show that the

 2    defendant knew that the ammunition moved in interstate

 3    commerce.  If the government proves all of those things

 4    beyond a reasonable doubt, then it has proved the

 5    offense alleged in Count One.

 6         Let me turn to Count Two.  Again, possession

 7    is a key element.  That's what's charged.  Count Two

 8    charges possession of crack cocaine.  So I won't repeat

 9    the instruction of possession.  They apply just as I've

10    told you to the other matter.  What is possessed must be

11    shown to be, as alleged in the indictment, crack

12    cocaine.  Consider the evidence you have on that

13    question and see whether the government has proved that

14    there was a quantity of cocaine base or crack cocaine

15    that was possessed in the requisite way.

16         The government again must show that it was

17    done knowingly, again, voluntarily and intentionally and

18    not because of accident or mistake.  And for this count

19    in addition to possessing it, the government must show

20    that the defendant had a specific intent to distribute

21    it.  That is, the purpose of his possessing it was to

22    distribute it.  There's a difference in the law between

23    the crime of possessing a controlled substance and

24    possessing it with the intent to distribute it, two

25    different things.  So an element of the offense charged

PDF created with pdfFactory trial version www.pdffactory.com

1    is the defendant possessed it with the intent to

2    distribute it.

3            Again, as with knowledge, what a person

4    intends cannot be directly perceived or proved but can

5    perhaps be inferred.  And that's your judgment to make

6    from all the circumstances as you find them to be.

7    Perhaps the circumstances are the way a person acts or

8    behaves, the way other people act with respect to the

9    person, and all the other circumstances from the

10   evidence as you find them to be can lead you to infer

11   what a person intends.  One of the questions presented

12   to you is whether the government can prove that the

13   defendant acted with the intent to distribute cocaine

14   base, if the government, of course, has proved that he

15   possessed it in the first place.

16           Now, to "distribute" for these purposes, for

17   purposes of intent to distribute, distribute means

18   simply to transfer possession of the controlled

19   substance from one person to another.  It can include

20   any kind of delivery or transfer from one person to

21   another.  It often can include an economic transaction,

22   that is, a sale of the cocaine base for money but it

23   need not.  It could include a gift or any other

24   transfer.  The notion of distribution is passes from the

25   possession of one person to the possession of another

PDF created with pdfFactory trial version www.pdffactory.com

1    person.

2              Now, if you find on this count that the

3    government has proved that the defendant possessed

4    cocaine base with the intent to distribute it knowingly,

5    you're also asked to decide the quantity of the cocaine

6    base possessed because the indictment alleges that it

7    was a quantity of five grams or more.  You have evidence

8    that will bear on that question.  So that's a separate

9    question from whether the basic crime is proved.

10             Finally, the third count, very similar to the

11   second count, alleges possession of cocaine, this time

12   powder cocaine, with the intent to distribute.

13   Essentially the elements are very similar to the

14   previous possession of cocaine base with the intent to

15   distribute, must show possession as I've talked about,

16   must be knowingly done and knowingly possessed.  That

17   is, not by mistake or accident.  Must be a specific

18   intent to distribute it and in the way I've just defined

19   distribution or what it means to distribute.  If you

20   find all of those three elements with respect to the

21   third count, then the government has proved the case.

22   If you do not find all three, the government did not

23   prove the case and the defendant would be entitled to

24   your verdict of not guilty on that.

25             So that's all I'm going to say for now about

1    the elements.  That's what the government must prove

2    with respect to each of these counts.  You'll hear now

3    from the lawyers who will urge you to consider the

4    evidence in your deliberations on those questions, and

5    then I'll have a little more to say before you begin

6    your deliberations.

7              The format will be for final arguments that

8    the government goes first, followed by the defendant.

9    The government then has an opportunity for a brief

10   rebuttal.

11             MR. MITCHELL:  Thank you, your Honor.

12             Good afternoon, ladies and gentlemen.

13             Ladies and gentlemen, when you were summoned

14   as jurors and ultimately arrived in this case, you

15   weren't asked for any qualifications; you were asked to

16   give minor identifying information about yourselves.  We

17   went through a process by which certain people were

18   selected out because they may have had certain biases

19   that disqualified them.  You're sitting here asked to do

20   one thing, that is to apply the same common sense you

21   apply in your daily lives based on logic and your own

22   experience in dealing with people.

23             In this case, ladies and gentlemen, you have

24   heard several witnesses, one after another, ten

25   witnesses from the government.  They have each testified

1    about specific pieces of evidence that they either found

2    or saw or they heard.  When you start to pull all those

3    pieces together, one clear picture emerges and that is

4    Paul Hicks on January 20th, 2005 in Brockton was a felon

5    in possession of ammunition, possessed crack cocaine

6    with the intent to distribute it and possessed

7    cocaine -- powder cocaine with the intent to distribute

8    that.

9            Let's take a look at the evidence.  Let's

10   start with the obvious stuff.  He's a felon.  You've

11   heard testimony that he's been convicted on three

12   occasions of possessing cocaine with the intent to

13   distribute it.  The certified copies of conviction have

14   been admitted into evidence.  You'll see those.  Those

15   are Exhibits 17A, B and C.  We know also that what was

16   found in the basement was cocaine.  There's the

17   stipulation that I read into evidence, I think it was

18   yesterday.  The two items, the Exhibit 1, Government's

19   Exhibit 1, these are the drugs that were found in the

20   basement.  You know also that the crack that was found

21   among them, the crack cocaine that's right here, more

22   than five grams.  It's in the stipulation.  Both parties

23   stipulate 20.89 grams of crack cocaine.

24           We know also that the ammunition in this case,

25   this ammunition and the ammunition that you saw in the

PDF created with pdfFactory trial version www.pdffactory.com

1    picture, which I'll show you in a second, traveled in

2    interstate commerce.  We know that because of the

3    testimony of Special Agent Schafer who said that that

4    ammunition is manufactured in Minnesota.  So it had to

5    have crossed state lines to get here in Massachusetts.

6    We know all that.  We should opine that, as you'd

7    expect, that those rounds of ammunition traveled in

8    interstate commerce.  She also said there aren't any

9    ammunition manufacturers in Massachusetts.

10              Okay.  Let's talk about the drugs.  What do we

11    know first?  We know, again, we know that that stuff is

12    cocaine.  We know also -- we know also that somebody in

13    that house was selling it.  We know there was somebody

14    selling it.  There was drug paraphernalia all around the

15    house, paraphernalia recognized by all of those trained,

16    experienced narcotics investigators as being associated

17    with cocaine distribution.  There were scales in the

18    kitchen cabinet, there was a scale -- digital scales in

19    the kitchen cabinet, same kind of digital scale down in

20    the basement along with baking powder, along with

21    plastic bags right near where the drugs were found on

22    the weight bench.  It was all over the place.  It was in

23    plain view.  There's no question that somebody was doing

24    it.  And we also know just based on the amount of drugs,

25    Trooper LeVangie told us this is worth $13,000 in

PDF created with pdfFactory trial version www.pdffactory.com

1    Brockton.  Thirteen thousand dollars.  That isn't used

2    for personal consumption.  Somebody's dealing that

3    stuff.

4              So there's no question that somebody in that

5    house was selling cocaine.  So the question is who?  Who

6    was doing it?  What do we know about the house?  Well,

7    we know, first of all, that it was owned by Renee

8    Yarrell.  Mrs. Hicks acknowledged that when she

9    testified on behalf of the defense.  Trooper Telford did

10   as well.  We know that she lived there.

11             We know there are three bedrooms in that

12   house.  The testimony of the troopers was two -- and the

13   officers was -- two of those -- two of the three

14   bedrooms had children's stuff.  They were the children's

15   rooms.  They saw two children when they walked into the

16   house earlier, two children watching TV.  Those rooms

17   are theirs.  So it leaves one adult bedroom, the

18   master -- what they described as the master bedroom.  In

19   that room, men's clothing.  We know Renee Yarrell's got

20   to sleep in some bedroom.  There's also men's clothing

21   in that bedroom.  There was somebody in addition to her

22   living there.  There was men's clothing.  Remember

23   Officer McDermott's testimony was there was men's

24   clothing in bags on the floor.  He and others testified

25   that there was men's clothing in the closet.  So

PDF created with pdfFactory trial version www.pdffactory.com

1    somebody else was living there.  It's not as though
2    someone just left a shirt behind.  Somebody had
3    established themselves, had settled into that bedroom
4    other than Mary Hicks (sic).
5          So who was that person?  Who was that man?
6    This man right here whose sitting right here.  How do we
7    know that?  We know that they were boyfriend and
8    girlfriend.  His own mother said so.  We know that
9    because Trooper Telford said so.  We know that also
10   because we've seen them together.  Here they are.  This
11   is Exhibit 13.  We know he was living there because
12   there are utility bills in his name.  The electric bill
13   was in his name, cable was in his name, and the land
14   line was in his name.  All three.  All of them.  They're
15   all in the defendant's name.
16         The defendant -- one reason why someone might
17   put utility bills in his own name is because he's using
18   utilities.  I mean, it's as simple as that.  He's using
19   utilities, therefore, he puts them in his name.  Someone
20   signed him up and sent the bill to him at the address.
21   Well, if he wasn't using them, he like any of us would
22   probably have objected to that.  He received them.  They
23   were in his presence.  Now, one might argue, well, look,
24   you know, she had bad credit and she, you know, had to
25   have the bills in somebody else's name because she

PDF created with pdfFactory trial version www.pdffactory.com

1    couldn't get the lights turned on because she hadn't

2    been paying her bills.  Well, if that were the case, you

3    wouldn't expect the defendant to be telling his friends

4    that he lived there.

5              This is a personal letter to him.  This is

6    Exhibit 12.  It's to him.  It has nothing to do with

7    credit.  He's telling people, holding himself out to the

8    world at that time that he lived at 15 Cabot Street in

9    Brockton.  This is from a friend of his.  You tell your

10   friend you're living in a place after all, you live

11   there.  Why would he lie to his friend?  Why --

12   receiving a personal letter from a friend.  To receive a

13   personal letter, he tells his friend he lived somewhere

14   else.  That wouldn't make any sense now, would it?

15             We also know the defendant was seen at the

16   house.  Just days before the search Officer Costello was

17   doing surveillance on Cabot Street, saw the defendant

18   get out of the same car they saw the night of the

19   search, the Mazda MPV van, and he walked directly into

20   the house.  His mother said he's at the house.  His

21   mother went to the house occasionally.  They were that

22   close.  She not only her son and Renee Yarrell, but

23   herself and Renee Yarrell, she went to the house.  She

24   went and rescued the children from -- during the

25   search.  The family were that close.  So we know he's at

PDF created with pdfFactory trial version www.pdffactory.com

1    the scene.

2              We also heard from his neighbor, the booking

3    officer, Patrick O'Malley, who said, you know, I saw him

4    go in there -- I think I have his testimony right, your

5    memory controls, but I think he said he used to go in

6    there frequently.  Sometimes go down to the porch, walk

7    in with a bag, he would see the defendant in the

8    morning.  So he's at the house.  People see him there.

9              But most of all, ladies and gentlemen, we know

10   he lives there.  We know he lives there because the

11   evidence tells us he made himself at home there.  Here's

12   a guy when they walk in, he's sitting on the bed, he

13   just got out of the shower.  He's familiar enough with

14   the place that he showered there.

15             We also know, and this is a subtle piece of

16   evidence focused on the cell phone, but one of the

17   things that's significant about the cell phone is what

18   he did with it.  They find him -- they go into the house

19   at 6:40 on the 20th of 2005 and they find him, he's wet,

20   he just got out of the shower.  A half hour earlier we

21   know that he was on the phone.  Look at his phone

22   records.  We went through them in testimony.  That's

23   Exhibit 4.  He had made a phone call before he went into

24   the shower.  What did he do with the phone?  He

25   didn't -- if he didn't live there, you'd expect him just

PDF created with pdfFactory trial version www.pdffactory.com

1    to put it on the countertop, right?  If you're in

2    somebody else's house, you go do something you put your

3    close personal items like the cell phone on the

4    counter.  He put it inside the drawer.  Only people who

5    live in a place actually put stuff inside a drawer like

6    that.  He lived there.

7              And we know, ladies and gentlemen, that the

8    evidence tells us also when we apply our common sense to

9    it, that he was selling drugs out of that house.  We

10   know that for a few reasons.  Remember what Trooper

11   LeVangie told us about the way narcotics dealers in

12   Brockton, cocaine dealers, handle cash.  They do two

13   things.  They keep it close, for one, because they don't

14   want -- they don't want to be ripped off, right?  But

15   they also have cash ready because they need to buy drugs

16   from their suppliers.  Well, we see both here.  We

17   see -- we find -- we hear the testimony of Officer

18   McDermott, who found a large wad of cash in a man's coat

19   in the bedroom.  The only man around was this man right

20   here.  Just a few feet away.  Now, would you expect

21   somebody just to leave $2,000 in cash in a bedroom like

22   that in a house where there's drugs around?  Does that

23   comport at all with what you've heard about the

24   narcotics trade from Trooper LeVangie?  It doesn't make

25   any common sense at all.  The only person who could have

PDF created with pdfFactory trial version www.pdffactory.com

1   possessed that cash is Paul Hicks.

2           And the other thing to consider is of course

3   he would have cash on him.  He's getting cash from

4   somewhere.  We know he didn't earn that cash.  He didn't

5   have a job.  His mother and his father weren't giving

6   him that much money.  She said 125, 150 bucks a week.

7   Someone who is getting that kind of money from their

8   parents and presumably is spending on everything we

9   spend money on, gas, food, everything else, wouldn't

10  have a wad of $2,000 in cash on him.  He got it from

11  somewhere else.  He got it from selling cocaine.  That's

12  where it came from.

13          We also know based on Trooper Levangie's

14  description of what cocaine dealers do and the way they

15  protect themselves is that they use firearms and

16  ammunition and holsters and magazines, all the things

17  that you saw, with the exception of the firearm, in

18  proximity to the defendant.  In the same bedroom, the

19  same bedroom.  It was all right there.  Another sign

20  that he's in the business.

21          And then you heard, remember you heard Trooper

22  LeVangie -- Trooper Levangie's description of the way

23  narcotics dealers use cellular telephones.  They use

24  them unlike the rest of us.  They use them to do all the

25  business because of their mobility, because they're easy

PDF created with pdfFactory trial version www.pdffactory.com

1    to get, because they're easy to discard, they're easy to

2    put in other people's names.  This was his -- we know

3    this was his cell phone.  Now, we know it because it was

4    found there.  Trooper Long pressed a few buttons and

5    pressed my info on this and turned out to be the same

6    number on the records.  We look at the records -- this

7    is Exhibit 4 again.  Paul Hicks' cell phone.

8              First call opens the account.  You'll see the

9    account opened on 1/18/2005.  First call on 1/18/2005

10   with that brand new cell phone account was at 4:32 p.m.

11   Time of the search, the last call he made before the

12   search was at 6:08 p.m.  So two days and a little under

13   two hours.  And during that very brief period of time he

14   made 161 phone calls.  Think about that.  He's on the

15   phone constantly during that period.  I don't know how

16   anybody could make -- well, strike that.

17             Use your common sense.  Does that sound like

18   anybody -- does that sound like the kind of call volume

19   you see on a full-time student's cell phone records?

20   No.  It's not.  He's selling drugs.  He's talking to

21   suppliers, he's talking to customers.  One hundred

22   sixty-one telephone calls.

23             And you'll note also some testimony toward the

24   end today that -- about the account being picked up.

25   You lose a cell phone, someone else can go in and say --

1    someone can go in and say, well, I lost my cell phone.

2    I'll leave it to your experience.  There are calls later

3    on you'll see, somebody's evidently using a phone that

4    they picked up in this account.  But what's significant,

5    however, ladies and gentlemen, is after he makes that

6    one -- that last phone call at 6:00 on the 20th, there's

7    another call the next day -- Trooper LeVangie explained

8    that investigators oftentimes will pick up a phone and

9    make a seizure and search, make a call to see who the

10   drug dealer's calling.  After that, there are no calls

11   for two weeks.  The calls stopped.  He's been arrested,

12   the phone's been taken away from him, there are no

13   calls.  We go from two days worth of 161 calls, we get a

14   call by an investigator next day, and then there's

15   nothing.  And then somebody evidently picks up the

16   account from there.  Take a look at Exhibit 4.

17           There are multiple connections -- multiple

18   evidence suggesting a connection to him and the drugs in

19   the basement as well.  His own bills are in the

20   basement.  The Comcast bill says basement apartment.

21   The weight bench itself, a clever place to put cocaine.

22   Who do you think thought of that?  Renee Yarrell?  Was

23   it her children?  Who among them based on your

24   experience is probably using a bench press.  You'll see

25   the picture.  Who's probably lifting weights and

1    thinking down, boy, I could probably put drugs in those

2    legs.  This man right here.

3             Trooper Telford told us that he found a

4    notebook in the van, the van that was parked in the

5    driveway at the time of the search, had Bay State School

6    of Technology printed on it, where he went to school.

7    Within that notebook he also found notes about weight

8    lifting.  Again, this man was down using that weight

9    bench.

10            And based on his conviction, three convictions

11   of possession of cocaine with the intent to distribute,

12   one after another, he knows very well what the scales he

13   saw and the baking soda he saw and the bags he saw are

14   used for.  They're used in the drug trade.  He knows

15   what they're used for.  Perfectly evident to him.  It's

16   not -- there's no mistake here.  I mean, he knew that

17   there were -- there was no mistaking that by someone who

18   has had those experiences that there are drugs in the

19   house.  And those convictions also show that he

20   wasn't -- he wasn't consuming those drugs.  There was no

21   consumption material found during the search.  He

22   intended -- he intended to distribute those drugs.

23            Now, there's no evidence that there was

24   somebody sort of wandering through the house and was

25   making drugs there and was distributing them outside the

PDF created with pdfFactory trial version www.pdffactory.com

1    house.  That wouldn't make any sense at all.  There have

2    been some names bandied about in the course of the

3    testimony.  The only evidence that there may have been

4    other people living there came from Mrs. Hicks on direct

5    examination, that there was an individual named Aaron

6    Heywood who lived there for a while, a Wayne Heywood.

7    And then afterward on cross-examination she said I

8    really didn't know when they were there or when they

9    were coming and going, I just don't have a memory of

10   it.  So she couldn't say.  She couldn't say who was

11   living there January 20th, 2005.

12           And it wouldn't make any sense.  It wouldn't

13   make any sense at all.  It wouldn't make any sense at

14   all that somebody who didn't live there would keep the

15   drugs there in that amount.  Who would leave -- even in

16   a good hiding place, who would leave $13,000 worth of

17   cocaine readily transferable into cash on the streets of

18   Brockton behind in a house where he knows other people

19   live and where there are signs of drug activity so that

20   people recognize those signs, maybe start to look for

21   drugs if they thought any were hidden.  Wouldn't make

22   any sense for anybody.

23           It wouldn't make any sense for people to leave

24   cutting agents there.  You saw the board.  You saw the

25   sill where the cutting agents were found.  This is a

PDF created with pdfFactory trial version www.pdffactory.com

 1    flat surface in the basement.  This is where the cocaine
 2    was made, this is where the cocaine was cut.  There's
 3    testimony from Trooper LeVangie that that cocaine was
 4    uncut.  It hadn't been fully diluted with baking
 5    powder.  There was still more product to be made.  This
 6    is where they made the product.  It wouldn't have been
 7    practical at all for somebody to go in and out of the
 8    house undetected and go out and sell the drugs.  These
 9    items were being cut by someone who lived there.
10            And so who possibly could that have been?
11    Could it have been Renee Yarrell?  Could those have been
12    her drugs?  Well, maybe, yeah.  She could have been
13    selling them, too.  And I turn you back now to the
14    instruction about joint possession.  More than one
15    person can possess an item.  More than one person.  And
16    so -- and we know that if they're her drugs, they're his
17    drugs as well.  We know that because you heard the
18    tape.  You heard him tell her exactly what she -- what
19    he wanted her to do.  He wanted her to sell cocaine for
20    him.  She wasn't -- listen to that tape.  And you should
21    listen to it.  You'll have a tape player, which is
22    somewhere here, a tape player to bring back to the jury
23    room to listen to that recording.  Listen to the
24    recording.  He -- she wasn't doing any of this on her
25    own.  She was doing it all at his behest.  That was his

PDF created with pdfFactory trial version www.pdffactory.com

1    modus operandi, that was his practice, that was his

2    method, to tell her to sell the drugs on his behalf.  So

3    if those drugs happen to be that day happened to be

4    Renee Yarrell's, they also happen to be Paul Hicks'.

5              That's the cocaine.  What about the

6    ammunition?  This is the picture.  This is Exhibit 6.  I

7    mean, come on.  This drawer, this is the front of the

8    drawer as I explained to you, this is the ammunition,

9    this is the cell phone he just used, here's his money,

10   here's his watch, here's his key.  Did he exercise

11   control of that?  Absolutely.  Did he intend to?  This

12   is where he puts his personal stuff.  This is something

13   familiar to all of us.  Each of us has a place in the

14   house where we sort of -- we dump our stuff.  We dump

15   our stuff in the same place every time because we don't

16   want to go around looking for it.  You have to run out

17   of the house, you don't want to forget things.  This is

18   where he put this stuff.  This was his drawer.  And in

19   order to get at the cell phone, which we know was his,

20   and the cash which nobody leaves cash around, you have

21   to reach over the ammunition itself.  Of course that's

22   his ammunition.  This is all his stuff.

23             All of it, the cell phone, the watch that he

24   would have taken off just before he got in the shower,

25   the key and his money.  There's no question, ladies and

PDF created with pdfFactory trial version www.pdffactory.com

1    gentlemen that, he constructively possessed these items.

2            Now, you one might say, well, that box wasn't

3    fingerprinted.  The loose ammunition was fingerprinted,

4    the phone was printed.  No prints were lifted off of

5    anything.  Not just his prints, anybody's prints.  And

6    so you look at that box.  It's just like -- that box is

7    just like that box.  The Arm & Hammer box.  No prints

8    were lifted off of that.  No reason to expect that

9    prints would be lifted off of this box or any of these

10   other things.  You heard what Trooper Silvia said.  He

11   said he only gets a 10 percent hit rate.  This isn't

12   CSI.  As he said, you don't get prints in every

13   incidence.  He said 10 percent.  There's a reason for

14   that.  Should the trooper, should the officers have

15   handled the stuff a little more delicately?  Maybe.  But

16   they go into a house in the heat of the moment, they

17   have to handle things like ammunition carefully.  They

18   have to be handled.  So ultimately, these were put in

19   evidence.  And they had to handle them.

20           You'll notice also there was some testimony

21   about the other picture, Defense Exhibit No. 1.  Two

22   pictures, right?  Two pictures of the same -- I'll hold

23   this one up.  This one obviously isn't blown up.  The

24   same stuff.  There's testimony things were moved

25   around.  You'll notice -- I'll go like that.  They had

PDF created with pdfFactory trial version www.pdffactory.com

1   to pull the holster back in order to take a shot of the
2   cash, which you see right here, and the cell phone which
3   you see right here.  And moving it evidently to move the
4   magazine.  There's no evidence they planted two 9
5   millimeter magazines in there.  There was already one in
6   there as it is anyway.
7           And what was most important was, in their
8   testimony, was the location.  They took this picture out
9   in the kitchen.  What's important is location of the
10  ammunition.  Each of the officers who saw this drawer
11  were asked where did you see the ammunition when the
12  drawer was opened up?  Right here.  It's right in the
13  front.  In order for him to reach anything else in that
14  drawer, he'd have to reach over that ammunition.  It's
15  not like it was tucked in the back.  It was right here
16  in front, full view.  It's not like one might conclude,
17  well, it was tucked in back, he didn't know it was
18  there.  He knew it was there.  There's no accident or
19  mistake.
20          I'd ask you, ladies and gentlemen, to focus on
21  this picture.  And remember where he was when he was
22  found with it.  He had just gotten out of the shower, he
23  was sitting down, he was right in front of the night
24  stand and, you know, according to the testimony of the
25  officers, within arm's length of it.  He was facing it

1    and you fully expect under circumstances that he was

2    about to go into it because that's where his cell phone

3    was.  The guy who had been on the phone -- who had

4    received or made 161 calls the previous two days.

5    That's the first place he went, back to where he kept

6    the stuff.  And they caught him red-handed.  They caught

7    him red-handed with this stuff.  So this -- all of his

8    ammunition, box of ammunition and the loose ammunition.

9           For all these reasons, ladies and gentlemen,

10   the evidence leads to one conclusion:  Paul Hicks was

11   selling drugs out of 15 Cabot Street, that he possessed

12   those drugs, and he was a convicted felon at the time

13   who possessed part of -- as part of his job as drug

14   dealer ammunition, which you see in the drawer.  And I

15   ask for all those reasons, ladies and gentlemen, that

16   you return verdicts of guilty beyond a reasonable doubt

17   on all three counts in the indictment.  Thank you.

18           MR. KROWSKI:  May I, your Honor?

19           THE COURT:  All right, Mr. Krowski, fine.

20           MR. KROWSKI:  Thank you.

21           Mr. Mitchell, your Honor.

22           The accusations, as I stated in my opening

23   remarks, are brought by Mr. Mitchell on behalf of the

24   United States government.  Pretty powerful thing.  This

25   courthouse that we're in is owned by the United States

PDF created with pdfFactory trial version www.pdffactory.com

1    government.  Pretty powerful thing.  But the United

2    States government doesn't hold any preeminence over a

3    United States citizen.  A United States citizen, which

4    is what Mr. Hicks is, enjoys several constitutional

5    protections.  They're not mere words; they're not

6    technicalities.  They are fundamental, monumental

7    rights.  The first is is he was presumed innocent when

8    the trial started.  He had that constitutional

9    presumption all throughout the evidence.  As a matter of

10   fact, as he sits there right now, his legal presumption

11   is that he is innocent.  It doesn't just automatically

12   get taken away merely because the government makes an

13   accusation, merely because the government puts on some

14   witnesses, merely because the government tells you, oh,

15   it's common sense, of course he lived there, of course

16   they were his drugs.  It requires sufficient evidence to

17   prove beyond a reasonable doubt; and if they can't do

18   that, he holds on to that fundamental, monumental

19   right.

20        Now, you all went through the questionnaire

21   process and you all indicated that you didn't know

22   Mr. Hicks.  You might know a little bit more about him

23   today than you did Monday, but it's fair to say he's

24   still a perfect stranger to you.  You have to apply

25   these constitutional principles to a perfect stranger

PDF created with pdfFactory trial version www.pdffactory.com

1    because, if you don't, you devalue and diminish the

2    worth of those rights to each and every one of us.

3              The government is required to prove that

4    Mr. Hicks knowingly and intentionally possessed

5    ammunition while being a convicted felon and knowingly

6    and intentionally possessed cocaine in its crack-base

7    form and its power-base form and he did so with intent

8    to distribute that.  I would submit to you as a matter

9    of law they have not done that in this case.

10             Now, there's two ways to prove possession.

11   His Honor instructed you to that.  Mr. Mitchell I

12   believe in his opening remarks on Monday gave you his

13   interpretation of that.  Actual possession is dead on

14   arrival.  Certainly no indication, no evidence, no

15   information, nothing you can point to that the

16   government produced for you that Mr. Hicks was ever in

17   actual possession of ammunition, that Mr. Hicks was ever

18   in actual possession of powdered cocaine, or that

19   Mr. Hicks was ever in actual possession of cocaine in

20   its crack-based form.

21             Within evidence and for your consideration for

22   a limited purpose, you have the fact that back in 1991,

23   1995 and 1996 Mr. Hicks had prior convictions for the

24   possession of cocaine with the intent to distribute and

25   one of them was for distribution.  You cannot take that

PDF created with pdfFactory trial version www.pdffactory.com

1    evidence and consider it for character evidence.  What
2    that means is he's presumed innocent in this case.  You
3    can't say did it before, did it again.  You can't
4    consider he's a bad person.  You can't consider he's a
5    person of bad character.  You can't consider it for its
6    propensity.  You can't think that because he did it
7    before, he did it again.  That's not what it's offered
8    for.
9            What it's offered for is the limited purpose
10   of two things:  One, that Mr. Hicks having seen the
11   cocaine would have known what it's for.  Of course.
12   There's no real dispute based upon his prior convictions
13   that he knows what cocaine looks like.  Of course he
14   does.  That's not argued.  But they've got to show more
15   than knowledge that he knows what it looks like.
16   They've got to show that he knew it was in that house,
17   and then they've got to show that he had the intention
18   to possess it.
19            Now, because actual possession is absolutely
20   gone, they have to do it by constructive possession.  So
21   the first thing that they did -- and they know.  Don't
22   you think the experienced troopers in Brockton, police
23   detectives, know that actual possession was gone and
24   that even on constructive possession there wasn't a lot
25   of evidence?  Don't you think they tried too hard in

1    this case?  Take it from the start.  They want to put

2    Mr. Hicks at 15 Cabot Street.  Is there any realistic

3    argument that he didn't go there?  No.  Didn't visit

4    there?  No.  He's a 32-year-old man.

5            Now, the government wants to talk about common

6    sense and each person has their own life, but it is not

7    uncommon for a 32-year-old man, I'd submit to you, to go

8    to his girlfriend's house; if she has children, to go

9    there often to help out, to baby-sit the children.  Yes,

10   they even have a few articles of clothing.  Hey, 32

11   years old, even to spend the night on occasion, even to

12   spend the night on the weekends.  That doesn't make Paul

13   Hicks a resident of 15 Cabot Street.

14           You heard from his mother, Rosemarie Hicks.

15   And I'll concede this, you don't acquit or convict or do

16   either on sympathies or likes or dislikes or biases.

17   And you judge witnesses' credibility, that's a jury

18   question.  But do you really discredit her testimony?

19   Don't you think the fair and accurate testimony was that

20   Mr. Hicks was attending school?  This so-called drug

21   dealer didn't have money for his own car, had to borrow

22   either Rosemarie's car or his father, Paul Hicks, Sr.'s

23   car, would get up every morning at 6:30 because he had

24   that quasi contract with his parents, would go to

25   school, come home at 3:30 and, yes, would go over to 15

1    Cabot Street.  But he didn't live there.  He certainly

2    went there.

3              How else did they try to establish that he

4    lived there?  They put on Officer O'Malley.  Now keep in

5    mind this theme of trying too hard.  Officer O'Malley

6    testifies that he has seen him just a couple of times.

7    The guy lives 50 feet away and he's seen him a couple of

8    times.  Well, doing what?  Well, once on the porch.

9    What else?  Walking in the morning.  Where to?  I don't

10   know.  With what car?  No, just walking to the end of

11   the street.  When he was booked, didn't he give the

12   address of 56 Ithaca Road?  No.  Wasn't there

13   hesitation?  No.  Didn't Ernie Bell, the detective from

14   Brockton, tell you to just go ahead and put Cabot Street

15   anyway?  No.  Did it refresh his recollection when he

16   looked at the report?  It did but then he still said it

17   didn't happen.  They're trying too hard to make

18   Mr. Hicks a resident of 15 Cabot Street.

19              You know from the evidence that he was in

20   jail.  We admit that.  Again, you can't consider it for

21   that he's a criminal, he's a bad person.  But that house

22   was in existence then.  Renee Heywood lived there then

23   with her children.  It's her home.  It's her family's

24   home.  Her brother Aaron Heywood we know from time to

25   time would live there, even on occasion with his

1    girlfriend and his two children.

2            Trooper Telford gets up and testifies that

3    during booking his initial reaction was 56 Ithaca Road,

4    gave his mother's phone number.  And Trooper Telford

5    actually went ahead and told Officer O'Malley just go

6    ahead and put 15 Cabot Street.  Because they knew and

7    they were trying too hard.

8            Now, how else are they trying to show that he

9    lived at that address?  Well, you'll have his school

10   records.  And his school records will suggest that he

11   put 56 Ithaca Road.  But they have utility bills.  Was

12   there one government witness that didn't acknowledge

13   that in all of their vast experience, too many years to

14   count, that that was a common thing, they always

15   executed these types of search warrants and for a myriad

16   of reasons utility bills came back in people's homes

17   that didn't live there?  There could be any number of

18   reasons.  The person who lives there could be trying to

19   insulate themselves.  Maybe they're not creditworthy.

20   We simply don't know.  But who had the power here?

21   Whose case was it?  Who has the burden of proof?

22            Now remember, as you're going through the

23   facts, as you're deciding what the evidence is, keep in

24   mind this isn't some sort of an equal race.  Mr. Hicks

25   is the one with all the protection.  We don't have to

1   prove to you that he's not guilty.  The government,

2   they've got the burden.  They've got the burden to prove

3   this beyond a reasonable doubt.  The investigation was

4   in the complete power and control of the officers.  The

5   utility companies.  Did you follow through?  Did you

6   find a contract that Mr. Hicks had actually signed to

7   sign up for any of those utilities?  No, we didn't do

8   that.  Did you see if Mr. Hicks had paid for any of

9   those utility bills by check?  We didn't do that.  And

10  that would have been futile because we know from

11  Mrs. Hicks he didn't even have a checking account.  Did

12  you see with the company if there was one of those, and

13  we know in our experience, those voice recordings when

14  you have to switch utility service?  We didn't do that.

15  Well, their failure to do that, to follow through and to

16  give you that evidence can't be construed against

17  Mr. Hicks.  It's got to be construed against the party

18  with the burden, the government.  Keep in mind

19  reasonable doubt.

20          So look, of course he went there.  Of course

21  he was there on occasion.  Maybe often.  Doesn't mean he

22  lived there.  And, again, being merely present in a

23  place where drugs are kept and stored doesn't make one

24  guilty.  Even if the person has knowledge.  And you

25  heard the instruction.  They have to prove intent.  And

PDF created with pdfFactory trial version www.pdffactory.com

```
 1    in this case they cannot.  They execute the search
 2    warrant and Mr. Hicks is up in the bedroom.  Took a
 3    shower.  Again, 32-year-old male, is it that uncommon,
 4    that far fetched, that beyond our grasp that a
 5    32-year-old man after coming home from working with
 6    appliances and doing things like that would grab a
 7    shower while he's baby-sitting his girlfriend's kids?
 8    Not at all.  They execute the search warrant.  Does he
 9    run?  Does he struggle?  Does he flee?  Do they see him
10    over by that night stand closing it?  No.  What's he
11    do?  He says what's going on, what's going on?  He's
12    calm and he's cooperative.  The door on that drawer is
13    closed.  And let's deal with it this way, the ammunition
14    first.
15             Keep in mind again about trying too hard.  The
16    night stand is closed and they want you to believe they
17    open it up and they find his cell phone.  And you heard
18    when I believe Trooper Long -- again your memory
19    controls -- testified he first said that was an accurate
20    depiction of how he saw that drawer when it was opened.
21    And that's the one that you got in the blown up version,
22    with that cell phone almost touching that box of
23    ammunition.  And you saw the time of 8:22.  But then you
24    know or you find out that four minutes earlier, there
25    was another picture, and that's Defendant's Exhibit 1.
```

1  And it shows four minute earlier that phone was nowhere

2  near that box of ammunition.  They want you to believe

3  -- and the phone is hidden under a holster.  They want

4  you to believe Mr. Hicks came home from school, must

5  have taken his holster off, put it down, left bullets

6  exposed but hid that cell phone of his.  How do we even

7  know whatsoever that that phone was in there when they

8  found it?  Why didn't they take a picture of it when it

9  was up there?  Is this the original picture?  Well, the

10  government wants to talk about common sense.  Would

11  someone hide their cell phone under a holster and flop

12  some Polaroid pictures down over it?  No.  What they

13  gave you is the big blown up picture, with what is

14  purportedly his cell phone touching right up against the

15  ammunition.

16          And let's talk about the fingerprints.  The

17  government mentions CSI.  Well, we're not asking Horacio

18  and his crew to pull a needle out of a haystack.  This

19  is fingerprinting.  This is fingerprinting.  Don't you

20  think Trooper Silvia conducted the tests because he

21  expected he would find something?  Ten percent?  That's

22  ten out of a hundred.  He had almost 70 items.

23  Nothing.

24          So they don't have Mr. Hicks in possession of

25  a firearm.  They search that car and they find his

1    school books, but they don't find any firearm that would

2    match any caliber of this ammunition, they don't tell

3    you if the holster fit him.  You don't have the holster

4    here.  All they want to tell you is his cell phone was

5    in there.  And again, look at the position of the

6    money.  All this cash lying around.  The money's tucked

7    under the holster in that picture.  Then all of a

8    sudden, look at that.  Touching the phone, right out in

9    plain view.

10             So Trooper Silvia talks about this fuming

11    technique.  This is an advanced technique.  It's not

12    CSI.  It's a technique where super glue is vaporized,

13    bonds to a surface, and they're able to find a print.

14    And most prints, at least in his training and

15    experience, have an indefinite shelf life.  Well, what

16    are good surfaces?  Metal is one because it's hard and

17    smooth.  And he said paper was an excellent one.  Well,

18    do we have any fingerprints from the Federal Cartridge

19    box?  No.  Did you even test the Federal Cartridge box?

20    No.  Why didn't you do that?  Well, probably because the

21    investigator mishandled it and testing would have been

22    futile.  And I'm paraphrasing his words.  Again, who is

23    that construed against?  Mr. Hicks who has no burden and

24    is presumed innocent or the party with the burden, the

25    government?  They mishandled evidence so they couldn't

PDF created with pdfFactory trial version www.pdffactory.com

1    get a fingerprint off of it?  What about all the bullets

2    in that box?  What about these shell casings?  What

3    about these?  What about the watches?

4          Do you really believe they didn't find one

5    single latent print in 70 items examined?  Or do you

6    really believe because they had a card with his known

7    fingerprint sample on it, they just couldn't find one

8    that matched him.  Seventy items in a house they claim

9    he lives in, not one item of contraband had a print that

10   they could compare to his?  What's the purpose of

11   Trooper Silvia even doing that if that's his results.

12         No evidence Paul Hicks ever possessed a gun.

13   No one ever saw him with a gun.  No one ever searched

14   the car and found a gun.  These bullets, if you believe

15   were there, were merely present.  There is no evidence

16   whatsoever to link them to him except the cell phone.

17         Now, the cell phone again, there is an

18   inference that that cell phone wasn't even in that

19   drawer and that, quite frankly, they knew they didn't

20   have evidence and were trying to too hard.  Cell phone

21   was in his name.  Did they do any follow-up on that?

22   How do they know he made the calls?  Those 160 calls.

23   Did you call them and find out who they were?  Did you

24   have any conversation?  Did you follow up with Nextel

25   and see if Mr. Hicks actually signed up for this?  We

PDF created with pdfFactory trial version www.pdffactory.com

1    know, I think it's a fair inference, that Miss Heywood

2    or Miss Yarrell, both names were thrown out in trial,

3    had no problem putting things in his name.  But even if

4    it was in his name, even if it was in his name, after

5    the date of arrest it's still being used.  And there was

6    some evidence, well, in investigations an officer might

7    grab the phone and use it and try to make some of these

8    calls.  You're going to see some of the calls back in

9    February were 47 minutes long.

10                There is no evidence whatsoever, keeping in

11   mind reasonable doubt and who has the burden of proof,

12   that Mr. Hicks ever possessed anything in this drawer.

13                So we go to the drugs in the house.  Again,

14   he's got the three prior convictions, but you talk about

15   trying too hard.  Let's -- the convictions are from

16   1996, 1995 and 1991, the oldest one being 15 years old.

17   What's that really tell you?  That in the past he had

18   involvement with it, would know what it looked like if

19   he saw it?  Sure.  But they can't argue that that shows

20   that he had the intent to exercise dominion and control

21   over these drugs and distribute them.  All they can show

22   is that he was present in a home where drugs were

23   found.

24                Now, there's some dispute as to who lived

25   there and who didn't live there, but certainly there's

PDF created with pdfFactory trial version www.pdffactory.com

1    evidence that other male individuals -- and, again,

2    there is no gender bias here, females and we know from

3    Trooper Telford can also be involved in the distribution

4    of drugs.  But we know Sean Yarrell went there, we know

5    Aaron Heywood.  We don't know exact dates and Miss Hicks

6    certainly didn't know exact dates, but we know Aaron

7    Heywood went there.  And Trooper Telford, who arrested

8    Aaron Heywood for narcotics knows that Aaron Heywood

9    went there, and we know Aaron Heywood was the brother of

10   Renee Heywood.  So there are certainly other people that

11   had access to that house.

12            But again, it's not our burden.  We've got the

13   presumption of innocence.  It's not our burden to prove

14   these drugs belonged to someone else.  It's their burden

15   to prove they belonged to him, either exclusively or

16   jointly.  Where's the proof that they belonged to him

17   jointly?  Well, you got that tape.  And again, when you

18   went through this screening process, you're really going

19   to have to call upon your duty and oath as an honor.

20   You swore that you could be fair.  You swore you

21   wouldn't base your decision collectively and

22   individually as a jury on bias, like or dislike, because

23   certainly there's dislikable things on that tape.  But

24   keep in mind again, the government's case.  That tape is

25   a year before this.  A year before this.  In the tape he

PDF created with pdfFactory trial version www.pdffactory.com

1    said many things.  And you don't need Trooper LeVangie

2    to tell you what was being spoken about.  No one's going

3    to insult your intelligence about powder and raw food

4    and cooked food and money and quantities.  Certainly a

5    year earlier there is some evidence that Mr. Hicks in an

6    exacerbated state, probably under a lot of stress,

7    called his girlfriend, Renee Heywood, probably said some

8    things that aren't very palatable, but you don't convict

9    on character.  What probative value does that have from

10   a year earlier?  Where's the evidence that whatever

11   happened back then didn't cease?  Where's the evidence

12   that this was an ongoing, jointly held operation by

13   Mr. Hicks and Miss Yarrell?  There isn't none.  Trooper

14   Telford did some periodic drive-bys, didn't really see

15   anything of note.  You don't have any evidence that what

16   happened a year before was what happened a year later.

17   In fact, what did Mr. Hicks do when he got out of jail?

18   Hardly the profile, and you heard the expert testimony,

19   he's going to school and he's going to school each and

20   every day and he's learning about appliances.  And his

21   mother who had that contract with him testified.  Now,

22   again, you judge credibility.  Don't you think she was

23   candid and forthright and credible?  And it's a jury

24   question, it's not for me to tell you.  But he got up

25   every day and went to school.

PDF created with pdfFactory trial version www.pdffactory.com

```
 1          The items that they found, again, think about
 2    trying too hard.  They find digital scales in a kitchen,
 3    in a cabinet.  Now you heard the profiles of these
 4    people that distribute drugs and these delivery
 5    services.  Fairly sophisticated.  They protect
 6    themselves, they make arrangements with money, make
 7    arrangements for guns.  They know how to insulate
 8    themselves.  But the government on behalf of the
 9    officers who conduct the investigation want you to
10    believe that Paul Hicks, now we know he has this prior
11    knowledge from these 15-year-old convictions, would put
12    tools of the trade, scales, in a cabinet, close the door
13    and would leave a bill in his name right next to the
14    scales.  That is not on training experience consistent
15    with someone insulating themselves, protecting
16    themselves or running a sophisticated drug operation or
17    selling drugs out of that house.  And think of these
18    utility bills.  It seems wherever something popped up, a
19    box of sandwich bags or packaging materials or scales,
20    wherever something was found would pop up one of these
21    mystery utility bills right next to it.  As if someone's
22    saying for all the world to say these are mine.
23    Ridiculous.  It's absurd.  You want to talk about common
24    sense and all this training and experience, why would
25    someone do that?  They would not.
```

1          The Glad sandwich bag.  No fingerprints on

2    that connecting Mr. Hicks to them.  None of the

3    packaging materials.  No fingerprints on those.  The

4    scales.  Hard plastic.  You'll have them in evidence.  A

5    good surface for a fuming technique fingerprint.  Not

6    one fingerprint that can match Mr. Hicks.

7          Trooper LeVangie testified in a way that I'll

8    concede is favorable to the government, but in a way

9    I'll tell you is the way he's testified his last 300

10   times.  Always testifies favorable to the government.

11   And what probative value can you give that?  He didn't

12   come in and tell you what a generic drug operation looks

13   like.  He came in, he was briefed, he knew the exact

14   details about this case.  And then he profiled, he

15   mirrored the generic drug deal to look like this case.

16   Isn't that obvious?  He talked about, well, they

17   sometimes arm themselves for security.  But then they

18   lend their guns out.  Well, because he knew that there

19   was ammunition found but no gun.  And that's all

20   assumption and speculation.  Even he admits it's not a

21   science.  There's guesswork.  And you don't convict

22   beyond a reasonable doubt on guesswork.

23          Then he talked about the cash and people

24   securing lawyers.  And he admitted he heard the

25   transcript about getting a thousand dollars to the

PDF created with pdfFactory trial version www.pdffactory.com

1    lawyer.  Again, a year earlier.  What is the evidence?

2    There is no evidence.  It is speculation.  It is

3    assumption.

4           Now, you don't have to like Mr. Hicks.  That's

5    not part of the equation, like and dislike.  In fact,

6    you don't even have to like your verdict.  You don't go

7    in there collectively with the thought we can't let

8    someone maybe get away with something.  That's not what

9    you do.  Your oath is to hold them to their burden of

10   proof beyond a reasonable doubt.  I would submit to you

11   in this case they have not met that burden.  If you

12   consider all of the evidence, or better put lack

13   thereof, and you consider it in that context of

14   reasonable doubt and the presumption of innocence, the

15   only verdicts you'll be able to come back with as a

16   matter of law are not guilty.  Thank you.

17          THE COURT:  Mr. Mitchell, for a brief

18   rebuttal.

19          MR. MITCHELL:  Thank you, your Honor.

20          Ladies and gentlemen, Mr. Krowski's right.

21   Reasonable doubt is a high burden.  And for good

22   reason.  But it's the same burden every jury in a

23   criminal trial has applied since the founding of the

24   republic, in every state throughout this country.  And

25   you are no less qualified to apply that standard in this

PDF created with pdfFactory trial version www.pdffactory.com

1  case.

2        Let's talk about the evidence.  This is his

3  cell phone.  I mean, come on.  Trooper Long turned this

4  on, he read you the number.  Can you do it yourself.

5  We'll do it right now.

6        (Pause.)

7        I'm getting "Please wait," your Honor.

8        Well, while that's warming up, you saw Trooper

9  Long testify and he had his own Nextel phone, knew how

10  to get the number off the phone by hitting my

11  information and he read the number to you right off the

12  screen.  And then he turned to the -- and then he turned

13  to the photos -- excuse me, the phone records and

14  said -- and read the number there.  It's the same

15  number.  Who else was in the house?  I'll leave it to

16  you to do that in the jury room.

17        Who else was in the house?  There are two

18  children in the house.  Phone call had just been made on

19  that phone.  There are no other adults around.  It was

20  his phone, his phone.  There's nobody else around.

21  There's no suggestion that we planted the cell phone in

22  there.  And there's a good reason why this one isn't

23  blown up.  Because you can't see what else is in there.

24  This thing, and you heard the testimony of the officers,

25  when they take photos of the search site, sometimes they

1    have to take things from different angles and pull

2    things back.  You can't make out the phone very well

3    with the holster.  You can't even make out the cash.

4    You have to pull the holster back.  You can see it's

5    pulled back, it's draped over the drug.  Maybe pulling

6    it back it turned around, maybe they just straightened

7    it out so everything was visible, but the key testimony

8    was, and they all said this, corroborated testimony, no

9    contradiction at all, that ammo box was in the front of

10   the drawer.  I asked them that specifically; they all

11   said yes.  Was that in the drawer?  Yes.  Ammo in front

12   of it?  Yes.  Cash?  Yes.  These things were all there.

13   There's no suggestion that anybody stuck a phone in

14   there or magically materialized.  Their testimony is

15   consistent right down the line in terms of what was

16   contained in that drawer.  The drawer that was right in

17   front of the defendant as he sat down, the first thing

18   he did as he got out of the shower.

19            This surface isn't -- this a surface of a

20   box.  This is not -- this is not paper in the sense that

21   this is paper.  They're different.  Just as that Arm &

22   Hammer baking soda box has a gloss, so does that.

23   There's no suggestion that somehow that they said that

24   the reports which are in evidence that the fingerprint

25   reports say negative just only because they're negative

PDF created with pdfFactory trial version www.pdffactory.com

1    as to him.  They're negative as to everybody.  It's

2    entirely speculative that somehow they had it out for

3    him and sort of changed the test to -- or didn't do

4    certain tests because they wanted to convict.  There's

5    no evidence of that at all, ladies and gentlemen.  It's

6    entirely speculative.

7         Remember the testimony about what tests were

8    done.  Remember -- and remember that what he said was I

9    didn't get any prints; I only get 10 percent of the

10   prints.  That's it.

11        Finally, ladies and gentlemen, listen to the

12   tape in the jury room.  You'll have the means to put in

13   a tape.  Ask yourselves if things were so different a

14   year earlier.  A year after he -- a year after this man

15   told Renee Yarrell to sell cocaine on his behalf, the

16   year after that happened, same girlfriend, same house,

17   same drugs, which were hidden again, all the same method

18   of distributing cocaine.  Very little had changed in

19   that year.

20        For all those reasons, ladies and gentlemen, I

21   ask that you return verdicts of guilty.  Thank you.

22        (Concluded closings at 1 p.m.)

23        THE COURT:  Jurors, I'm going to keep you just

24   a little bit longer and ask for your attention as I

25   complete my instructions to you now.  I'm going to talk

1    a little bit about your fact finding function.  Remember

2    I gave you the principles of what the facts are that you

3    must find in order to find the charges proven.  Now I'm

4    going to talk a little bit about the process of

5    considering the evidence and coming to conclusions about

6    it.

7             We often say that jurors are the sole and

8    exclusive judges of the facts of the case.  You

9    determine the weight, the value and significance, the

10   meaning of the evidence you've heard.  Where there are

11   disputes about factual matters, you resolve them, so far

12   as you are able, from the evidence that you have in the

13   case.  You must determine the facts without fear or

14   favor, based solely on a fair consideration of the

15   evidence.

16            Now, that means two things.  Of course, first

17   of all, it means that you are to be completely fair and

18   impartial, swayed neither by prejudice nor sympathy,

19   personal like or dislikes toward anyone involved in the

20   case, rather your responsibility to judge the true

21   meaning of the evidence in the case fairly and

22   impartially.  Of course the second important point is

23   that your judgment must be based on the evidence that

24   has been presented to you in the course of the case.

25   You may not go beyond the evidence by speculating or

PDF created with pdfFactory trial version www.pdffactory.com

1    guessing what other things might also be true that

2    weren't shown in the evidence, but rather your

3    responsibility is to resolve the issues presented by

4    your thoughtful consideration of what has been presented

5    in the evidence.

6         Your conclusions should be those conclusions

7    that the evidence directs you to.  If you should have

8    questions that you're wondering about that you can't

9    find an answer to in the evidence, you have to leave

10   those questions unanswered.  You can't fill in any gaps

11   by speculating or guessing or supposing.  We ask you to

12   think about the evidence, to evaluate it, and then to

13   decide what value and meaning it has.

14        Let me just remind you what is not evidence.

15   I said this at the beginning of the case.  The lawyers'

16   statements to you both in the openings and now in the

17   closings are not part of the evidence.  They sum it up

18   for you, they try to give you a picture of the evidence,

19   but in the end it's your own collective appreciation of

20   the evidence that matters and not the lawyers' summaries

21   of it.  And the evidence, of course, is what has come

22   from the testimony and the exhibits in the case.

23   Nothing I have done with respect to the applying or

24   enforcing the rules of evidence is anything by way of

25   evidence.  Nothing I've said -- of course nothing I say

1    in these instructions count as evidence.  These

2    instructions, as the evidence rulings, have their own

3    purpose in the case, but it's not part of the evidence

4    and you shouldn't give any consideration to that but,

5    again, to the body of the evidence.  And of course

6    there's no significance in any sense from any of the

7    evidentiary rulings I've made, as I described to you at

8    the beginning of the case.

9            Now, you have some different categories or

10   kinds of evidence.  You have some stipulations.  A

11   stipulation, as I told you, is simply an agreement

12   between the parties to this case that you may take as

13   true a certain statement as contained in the

14   stipulation.  It takes it out of the range of being

15   contested.  You can accept those stipulated matters as

16   true and give them whatever weight or significance you

17   think those facts have in your deliberation.

18           You will have a number of exhibits.  And

19   you'll have those exhibits with you in the courtroom --

20   in the jury room for your deliberations.  And, again,

21   you can give them whatever consideration, weight and

22   value you think they fairly ought to have.  Some of them

23   you've seen briefly here in the courtroom.  You may have

24   a fuller opportunity to examine them, some of the

25   documents in particular, in the jury room.

1          There are in evidence a couple of items of

2     contraband, the cocaine and the ammunition.  And what

3     we'll do is we'll have the court security officer go

4     with you when you first go in with those items and let

5     you look at them as much as you want without discussion

6     because you can't discuss in his presence.  He'll then

7     take them back for security reasons.  If you ever want

8     to see them again, just let him know and he'll bring

9     them back to you.  So we'll begin by having you take

10    whatever time you want to look at those things.  As to

11    the other matters, you'll have the exhibits there for

12    your own control and give them whatever consideration

13    you think you ought to give them.

14          Now, there are, as has been noted to you, a

15    couple of matters in the evidence about prior occasions

16    when the defendant perhaps committed acts that may be

17    similar to what he's charged with here.  And it has been

18    correctly pointed out to you you may not consider that

19    evidence as tending to prove that because he did

20    something wrong on a prior occasion, he must have done

21    it wrong on the occasion that's at issue in the

22    indictment.  You cannot consider that evidence as

23    tending to show that he has a tendency or a proclivity

24    to commit the act and therefore he must be guilty.  If

25    you find him guilty, you must do it on the evidence that

1    is in the case and the meaning of that evidence.

2            Those things, those occasions which include

3    some prior convictions as well as a tape recorded

4    telephone conversation, those things can be considered

5    by you for this limited purposes, that is, whether the

6    government has shown that the defendant had the

7    knowledge and intention, perhaps the means, to commit

8    the offense that was -- that is at issue, the offenses

9    that are at issue in the indictment.  So those matters

10   of evidence of prior similar acts can be considered as

11   to whether the defendant acted knowingly and

12   intentionally and not because of mistake, accident or

13   some other innocent reason.  And you may or may not draw

14   any inference from that.  I don't say there is an

15   inference, but that's the purpose for the admission.

16   Limited to that consideration.  You may found it has no

17   value as to that, or you may find it has value and give

18   it some value.  Then that's entirely up to you.  What

19   you may to do is find him guilty because he may have

20   been guilty of some other crime on some other occasion.

21           Now, in addition to the exhibits, you have the

22   testimony of witnesses who appeared in front of you.

23   You've not only had the opportunity to listen to the

24   witnesses and hear what they've had to say but you've

25   had an opportunity to watch them while they testify.

1    You can take all of that into account in deciding the

2    weight, value, significance of the testimony.  Perhaps

3    there's something about the way the witness answered

4    questions that helps you decide how much weight or value

5    to give that.

6              As you think about the evidence from any

7    particular witness, you may find you find credible,

8    reliable, meaningful just about everything that witness

9    has said, perhaps just about nothing that witness has

10   said or perhaps something in between.  There's no

11   automatic all-or-nothing rule.  From any given witness

12   you may find some things reliable, acceptable and

13   meaningful and other things from the very same person

14   are that less reliable, less worthy of your trust and

15   credit.  So that's a judgment you should make together

16   as you talk about and go through the evidence and

17   consider its value to you.

18             So what you can do is you can think of course

19   about the content of the evidence itself.  Is it the

20   kind of thing that makes sense?  Does it have the ring

21   of truth, as we sometimes say, or is there something

22   about it that leads you to be skeptical or cautious in

23   accepting it?

24             You can consider how good the witness's memory

25   may be for events.  Some people may have better memories

PDF created with pdfFactory trial version www.pdffactory.com

1    than others.  You can consider how, if it's about things

2    that were done or observed, how good the witness's

3    observations were in the first place.  You can consider

4    how good the witness is in retelling what happened.

5    Some people may have a greater facility at retelling

6    what they remember from prior occasions.  All of those

7    are the kinds of things you can consider about any

8    particular witness.

9             You can consider any partiality that a witness

10   might have toward one side or the other, any reason or

11   motive or interest in the way the case comes out that

12   might have influenced consciously or unconsciously the

13   testimony of the witness.  Obviously in every case there

14   are people who are affiliated with one side or the other

15   or both.  And that doesn't automatically mean that they

16   are not to be trusted or believed for that reason, but

17   it's a fact you can think about as you decide whether to

18   accept and rely on that particular testimony or not.

19            You ought to consider the evidence from each

20   witness not only by itself or in isolation as if that

21   was the only person to testify, but in relation to all

22   the other evidence in the case.  For example, sometimes

23   you may when you first hear something think it sounds

24   pretty good until then you hear something else from

25   perhaps another witness and it doesn't sound so good

1    anymore.  Or vice versa.  Maybe you're a little bit

2    skeptical at first about what one witness tells you and

3    then you hear something later in the case or see

4    something else in the evidence and you feel a little bit

5    better about accepting that proposition.  So, in other

6    words, think of the evidence in its whole context, even

7    as you evaluate particular parts of it.

8            We ask you to reason about the evidence, to

9    think about what it means.  Now, reasoning sometimes

10   simply means making a decision whether to accept an

11   assertion of fact or not, but sometimes it means

12   deciding what conclusions can be drawn or inferences can

13   be drawn from the available facts.  And you may draw

14   inferences from the evidence.  An inference is simply a

15   little step in reasoning.  You have some information,

16   some data, and on the basis of that information or data

17   you draw an additional conclusion.

18           We say that facts can be proved in either of

19   two ways, either by direct evidence or by indirect or

20   circumstantial evidence.  Direct evidence is essentially

21   that kind of evidence where if you accept the piece of

22   evidence, it directly tends to establish the fact.  So,

23   for example, suppose somebody on the stand were to

24   testify it's raining outside.  Now you'd have to decide

25   whether that person was being truthful, had a basis for

PDF created with pdfFactory trial version www.pdffactory.com

1    knowing what the weather was and so on; but if he passed

2    all those tests, you could decide to accept that

3    testimony it's raining outside.  That would be sort of

4    direct proof, you accept the testimony as directly

5    established.

6         Not all facts necessarily are provable that

7    way.  Suppose instead of having somebody say that we had

8    somebody walk in the back of the courtroom with a rain

9    coat on that was dripping water and shaking water off an

10   umbrella that they were folding up.  Nobody will have

11   said anything about the weather, you won't have seen it

12   yourself, but you have some other information from which

13   you might draw an additional conclusion.  In your common

14   experience you might decide when somebody walks in

15   apparently from outside in that condition that it's

16   raining out.  And if that's a reasonable conclusion to

17   you, you may draw it.  That's indirect proof or

18   sometimes called circumstantial proof.  The

19   circumstances warrant, justify, lead you to draw an

20   additional conclusion about something factual.

21        I point that out because sometimes you hear

22   people in sort of casual conversation say that's just

23   circumstantial evidence, that doesn't prove anything.

24   Well, that statement's wrong literally.  Circumstantial

25   evidence does prove things.  And if you think about it,

PDF created with pdfFactory trial version www.pdffactory.com

 1    you probably rely on it rather heavily as you go through

 2    the day.  If you walk into the kitchen and see steam

 3    coming out of the kettle on the burner, you know enough

 4    not to put your finger on the burner because you've

 5    drawn an inference about how hot the burner is from the

 6    steam.  So circumstantial proof is a legitimate form of

 7    proving a fact.  You do have to be careful.  You have to

 8    be sure that the inference is one that is truly

 9    justified by the evidence, that the conclusion is one

10    that should be drawn based on your common experience

11    from those facts or data that you're relying on.  And if

12    you have a set of data or facts that seem to suggest

13    alternate inferences, this could be true or this also

14    could be true, you can't just pick one and not the other

15    unless you have some factual basis or reason for

16    choosing between them.  So if there are equally probable

17    inferences to be drawn, then you have to leave the

18    inference undrawn.  The evidence has to point you to one

19    over the other.

20           Now, I told you at the very beginning, and I

21    emphasize now because it's very important, that a

22    person -- the fact that a person is charged with a crime

23    is not evidence that the person has committed the crime

24    charged.  The fact that an indictment is returned

25    against a person making those charges tends not at all

PDF created with pdfFactory trial version www.pdffactory.com

1    to prove that the fact that the person has done what the

2    indictment alleges.  The indictment is simply a manner

3    or means of presenting the charge so that it can be

4    tried in a full trial such as we have had.  You will

5    have a copy of the indictment in the room with you for

6    your guidance so you can see what the charges are,

7    perhaps organize your deliberations.  But you should

8    give no weight or consideration to the fact that the

9    charge has been made.  Your judgment about whether the

10   defendant is guilty or not will be based on the evidence

11   in the case and not on the fact of the indictment.

12           Every defendant, including this defendant,

13   Mr. Hicks, is presumed to be innocent of the crime

14   charged unless and until the government has proved by

15   the evidence that he is guilty beyond a reasonable

16   doubt.  The burden of proof rests with the government.

17   The defendant assumes no burden to prove that he is

18   innocent.  The question is never which side has

19   convinced me but rather has the government convinced me

20   beyond a reasonable doubt that the defendant is guilty.

21   If the answer to that question is yes, then the

22   government is entitled to your verdict of conviction.

23   If answer is no, then the defendant is entitled to be

24   and must be acquitted.

25           A defendant in a criminal case has a right

PDF created with pdfFactory trial version www.pdffactory.com

1    guaranteed by the Bill of Rights and our Constitution to

2    choose not to testify in a case.  You may not under any

3    circumstances draw any inference or presumption against

4    the defendant for his decision not to testify.  You

5    should not even discuss the matter.  You are to decide

6    the issues presented solely from your consideration of

7    the evidence that has been given in the case.

8            Now, the burden placed upon the government to

9    prove a defendant's guilt beyond a reasonable doubt is a

10   strict and heavy burden, but it is not an impossible

11   one.  It does not require the government to prove a

12   defendant's guilt beyond all possible, hypothetical or

13   speculative doubt, but beyond a reasonable doubt.  There

14   are probably very few, if anything, in human affairs

15   that be proved to absolute certainty, and the law does

16   not require that.  But the evidence must exclude in your

17   minds any reasonable doubt about the defendant's guilt

18   of the crimes he is accused of.

19           Now, a reasonable doubt may arise from the

20   evidence produced or from a lack of evidence.  And if

21   you conclude the evidence may reasonably permit in its

22   entirety either of two conclusions, one consistent with

23   the defendant's guilt and one consistent with his

24   innocence, then you must find the defendant not guilty.

25           Reasonable doubt exists when after you've

PDF created with pdfFactory trial version www.pdffactory.com

1    considered and weighed all the evidence using your

2    reason and common sense, you cannot say that you have an

3    abiding conviction, a settled conviction, of the truth

4    of the charge.  Conversely we say that a matter is

5    proved beyond a reasonable doubt if after consideration

6    of all the evidence you are left with a settled

7    conviction that the matter is true and that you may rest

8    your verdict upon it.  A reasonable doubt is not

9    speculation, supposition or suspicion.  It is not an

10   excuse to avoid the performance of an unpleasant duty,

11   and it is not sympathy.

12          While the law does not require proof that

13   overcomes every conceivable or hypothetical doubt, it is

14   not enough for the government to show that the

15   defendant's guilt is probable or likely, even if it's a

16   strong probability.  The government must establish each

17   element of an offense by proof that convinces you and

18   leaves with you no reasonable doubt and thus satisfies

19   you that you can, consistently with your oath as jurors,

20   base your verdict upon it.

21          Now, there are three counts.  You should give

22   separate consideration to each count.  It may be as you

23   deliberate that you are -- that you come to the same

24   conclusion on each of the three counts, but there is no

25   necessary reason why that must be so.  You should give

1   separate and individual consideration to each of the

2   three counts.  Your verdict must be a unanimous one,

3   whether it is guilty or not guilty; that is, you must

4   deliberate with respect to each count until you have

5   reached a unanimous verdict with respect to that count.

6           It is my practice to permit the jury to select

7   their own foreman.  So one of the first things I suggest

8   you do is do that, appoint somebody who will act in the

9   administrative office, I guess, as foreman.  That person

10  really has a couple of responsibilities.  One is if in

11  the course of your deliberations you have any questions

12  about the law that you need to ask for further

13  instruction on, that person would do the communicating

14  with the court officer to let us know that's the case

15  about the question.

16          If you have a question about my instructions

17  and the law that applies that you can't resolve after

18  talking about it among yourselves, then we invite you to

19  ask that question.  We'd rather have you get a

20  clarification of what the law is than base your decision

21  on an error of law.  We cannot answer any questions

22  about the meaning of the evidence or the facts of the

23  case.  Those matters are entirely within your

24  responsibility and purview, and we have nothing to say

25  or help you with in that respect.  Questions of law,

PDF created with pdfFactory trial version www.pdffactory.com

1    yes; questions of fact or the evidence, no.

2         The other thing that the foreman will do is at

3    the end when you have a verdict, sign the verdict slip.

4    You will have a verdict slip, as you will see, which

5    goes through Count One, Count Two, Count Three and asks

6    for your verdict.  And the foreman when that's completed

7    will sign that.

8         Now, let me just see counsel before I ask you

9    to deliberate.

10        (Conference at sidebar commenced.)

11        MR. MITCHELL:  No objection.

12        MR. KROWSKI:  Defendant's satisfied.

13        (Conference at sidebar concluded.)

14        THE COURT:  Now, finally, let me just say that

15   each juror is entitled to his or her own opinion and

16   should in the end render a verdict which represents that

17   juror's conscientious view of the evidence.  Of course

18   that doesn't mean that you don't listen to each other,

19   talk with each other and deliberate collectively,

20   present your own views, consult with one another and see

21   whether you can, in your own individual, conscientious

22   judgment come to a unanimous verdict.

23        We have, I expect it's already there, a lunch

24   brought up to you.  So you don't have to worry about

25   that.  That should be in there and you can begin with

1    that, of course, as you begin your deliberations.

2                So with that now, jurors, we ask you to

3    withdraw, deliberate upon the evidence and return with

4    your verdict.

5                THE CLERK:  All rise for the jury.

6                (Jury withdrew 1:20 p.m.)

7                THE COURT:  All right.  We'll be in recess.

8                (Recessed, 1:22 p.m.)

9                (Court resumed.)

10               THE CLERK:  All rise.  Please be seated.

11               THE COURT:  The jury sent a question, which I

12   gather you've seen.

13               MR. KROWSKI:  Yes, your Honor.

14               MR. MITCHELL:  Yes, your Honor.

15               THE COURT:  Do you have any comments or --

16               MR. MITCHELL:  Your Honor, I would suggest

17   reinstructing them on circumstantial evidence.  It

18   sounds like that's what they're looking for.  I don't

19   see any issue with doing that.

20               MR. KROWSKI:  I would think reading verbatim

21   from the instruction on circumstantial --

22               THE COURT:  I didn't read verbatim the first

23   time.

24               MR. KROWSKI:  Well, I think -- and that

25   probably raises, of course I don't have a realtime

PDF created with pdfFactory trial version www.pdffactory.com

1   transcript of it now, but I would ask that it be read

2   verbatim or at least that we could discuss which parts

3   were ad-libbed because --

4          THE COURT:  The whole thing was ad-libbed.

5          MR. MITCHELL:  That's pretty good.

6          THE COURT:  I'll give them the elements of

7   it.  I don't think I have to go through the examples

8   that I gave again of raining outside and so on, but I'll

9   give them a shorter one.  The second part of the

10  question is "Is circumstantial evidence sufficient to

11  determine guilt?"  The answer is yes, so long as it is

12  appropriately used and that they are sure of the

13  inferences and that they are able to say at the end of

14  the process of inferring that they are convinced beyond

15  a reasonable doubt.

16         MR. KROWSKI:  I'd object to it.  I always

17  think it's hazardous to answer a question that calls for

18  a yes or no answer.  The problem being is circumstantial

19  evidence can be depending on -- but we don't know what

20  they're thinking.  I think you'd have to throw an

21  explanation in there that would have to be as to all

22  elements on each of the counts and reasonable doubt and

23  those propositions still stand.

24         THE COURT:  Well, I will caution them that if

25  they are relying on proof by circumstantial evidence

PDF created with pdfFactory trial version www.pdffactory.com

```
 1    that they must nevertheless be convinced beyond a

 2    reasonable doubt of the elements of the offense.  No

 3    question.

 4            Now, the other issue I have is they have also

 5    it says, "Please remind us about the elements of

 6    possession."  And then that's crossed out.

 7            MR. KROWSKI:  I took that to be they no

 8    longer --

 9            THE COURT:  They've withdrawn that question.

10            MR. KROWSKI:  That was my --

11            THE COURT:  I can either ignore it, or maybe I

12    can ask them whether they want that answered.

13            MR. MITCHELL:  Well, if you bring them back

14    out, I guess you could ask them.

15            MR. KROWSKI:  You could inquire of the

16    foreperson.

17            THE COURT:  I don't know who it is.  I can't

18    read the signature.  Okay, we'll bring them out.

19            THE CLERK:  All rise for the jury.

20            (Jury entered courtroom, 3:35 p.m.)

21            THE CLERK:  Please be seated.

22            THE COURT:  Jurors, we have your question

23    signed by the foreman, but I can't read the signature.

24    Who's the foreman?

25            THE FOREMAN:  I am.
```

1          THE COURT:  You have two questions:  "Please
2     remind us about the definition of circumstantial
3     evidence" and "Is circumstantial evidence sufficient to
4     determine guilt?"
5          As I told you, the law accepts two methods of
6     proving a fact, by direct evidence or by circumstantial
7     evidence.  Direct evidence is when the evidence itself,
8     if accepted as reliable and truthful and so on, more or
9     less by itself is a basis for believing a fact.
10     Circumstantial evidence occurs when you have facts that
11     you are satisfied are true and considering them and
12     thinking about them, as I said you're entitled to do,
13     you looking at that series of facts conclude that given
14     those facts, something else is probably or likely also
15     true.  That's a general inference.  In other words, you
16     draw inference or a conclusion from the other facts.  I
17     gave you some illustrations.  You have facts about the
18     rain on the rain coat and on the umbrella and from that
19     you draw a conclusion.  Nobody has seen the rain, nobody
20     said it's raining, but you have the conclusion that it's
21     probably likely raining because there's what you see and
22     you draw a conclusion from it or from the steam from the
23     kettle and so on.
24          So all circumstantial evidence is is an
25     inference or a conclusion that your minds are led to by

1    the evidence that you have already accepted as fact.

2    That is to say, it's not an excuse for guessing or

3    speculating.  You can't make up a conclusion.  But

4    rather it's a conclusion that the evidence directs you

5    to because in your experience, that inference is

6    justified by the underlying data.

7             Circumstantial evidence is a method of proof

8    in criminal cases, as in other cases, and a verdict of

9    guilty may be based on circumstantial evidence.  No

10   question about that.  You should be cautious that the

11   inferences you propose to draw are those that are --

12   that the evidence directs you to.  Again, it's not an

13   excuse for speculating or guessing.  But if the evidence

14   rationally leads you to draw an additional conclusion

15   beyond what is directly evident, then you may do so.

16             You should be further cautioned that of course

17   the burden of proof in this case is to prove the

18   elements of the offense beyond a reasonable doubt.  And

19   so when you use circumstantial evidence by itself or in

20   combination with direct evidence, at the end with

21   respect to the elements of the offense you must be

22   satisfied beyond a reasonable doubt that the government

23   has proved the elements of the offense.  You don't have

24   to find every individual particular fact in a case

25   beyond a reasonable doubt, but you have to be satisfied

1    at the end of the case that the government's charge

2    against the defendant concludes the elements of the

3    offense is proved beyond a reasonable doubt.  I hope

4    that is additional guidance which will help you in your

5    deliberations.

6           Now let me just ask you, you also had

7    originally apparently written "Please remind us about

8    the elements of possession," and then you crossed that

9    out.  Are you satisfied as to that or do you need a

10   further instruction with respect to what possession is?

11          Mr. Foreman?

12          THE FOREMAN:  We're satisfied, your Honor.

13          THE COURT:  You're satisfied, okay.

14          All right, I'll ask you to withdraw then and

15   consider this instruction, as well as all the other

16   instructions of course, and continue your deliberations.

17          THE CLERK:  All rise.

18          (Jury withdrew, 3:40 p.m.)

19          (Recessed, 3:40 p.m.)

20          (Court resumed, 4:05 p.m.)

21          THE CLERK:  All rise.

22          (Jury entered courtroom, 4:05 p.m.)

23          THE CLERK:  Please be seated.

24          Will the jurors remain standing, Mr. Hicks

25   remain standing.  Everyone else can be seated.

 1              Mr. Foreperson, has the jury agreed upon a

 2    verdict?

 3              THE FOREMAN:  Yes, we have.

 4              THE CLERK:  Can I have the form, please.

 5              (Clerk hands verdict form to the Court.)

 6              THE COURT:  You may announce the verdict.

 7              THE CLERK:  In criminal action 05-10204, case

 8    of United States of America versus Paul Hicks, the

 9    verdict,

10              Count One:  As to Count One charging the

11    defendant with Possession of Ammunition By a Felon in

12    violation of 18 U.S.C. Section 922(g)(1), we, the jury,

13    find the defendant, Paul Hicks, guilty.

14              Count Two:  As to Count Two charging the

15    defendant with "possession of cocaine base with intent

16    to distribute" in violation of 21 U.S.C. Section

17    841(a)(1), we, the jury, find the defendant, Paul Hicks,

18    guilty.

19              If you have the found the defendant guilty of

20    Count Two, do you find beyond a reasonable doubt that

21    the defendant, Paul Hicks, possessed five grams or more

22    of cocaine base?  Yes.

23              As to Count Three charging the defendant with

24    Possession of Cocaine With the Intent to Distribute in

25    violation of 21 U.S.C. Section 841(a)(1), we, the jury,

1    find the defendant, Paul Hicks, guilty.

2              Mr. Foreperson, is that your verdict?

3              THE FOREMAN:  Yes.

4              THE CLERK:  And so say you all.

5              (All jurors respond affirmatively.)

6              THE COURT:  All right.  The verdict shall be

7    recorded.

8              Jurors, with your verdict in the case, your

9    service as jurors is at an end and you are now

10   discharged.  If you'll withdraw into the room, I'll be

11   in in just a minute to say an informal good-bye and

12   thank you to you before you go on your way.

13             THE CLERK:  All rise.

14             (Jury withdrew, 4:08 p.m.)

15             THE COURT:  We'll set a date for sentencing.

16             MR. KROWSKI:  Yes.  Would the Court consider a

17   January date?  I can explain why.

18             THE COURT:  Yes.  That's where we're

19   scheduling.

20             THE CLERK:  Monday, January 22nd at 2:15 for

21   sentence.

22             THE COURT:  Make it 2:30.

23             THE CLERK:  2:30 on Monday, January 22nd.

24             THE COURT:  All right.  The defendant of

25   course remains in custody until then.  We'll be in

PDF created with pdfFactory trial version www.pdffactory.com

1    recess.

2                MR. MITCHELL:  Thank you, your Honor.

3                THE CLERK:  All rise.  Court will be in

4    recess.

5                (Adjourned, 4:10 p.m.)

6                      - - - - - - -

7                        CERTIFICATION

8          I certify that the foregoing is a correct

9    transcript of the record of proceedings in the

10   above-entitled matter to the best of my skill ability.

11

12   /s/ Shelly M. Killian
     Shelly M. Killian RPR, CM, CRR
13   Registered Professional Reporter
     May 19, 2008
14

15

16

17

18

19

20

21

22

23

24

25